## WASHINGTON ROCK CO. v. YOUNG et al.

No. 1565 (80 Pac. 382).

1. LOST BOUNDARIES—ESTABLISHMENT—ERRORS—RE-SURVEY—PUBLIC LANDS—PATENTS.—Where an original government survey of land was made before the township line was established, the fact that a retracing of such survey by the aid of the courses and distances given in the field notes for the purpose of discovering a lost boundary placed the corner of a section east of the township line as subsequently established, and in another township, could not injuriously affect the rights of a party holding under a government patent based on the original survey; such survey controlling.

2. SAME—ORIGINAL SURVEY—CONCLUSIVENESS—ERRORS — RE-SURVEY. On a re-survey of land to establish a lost boundary, the original corners established by the government surveyors, if they can be found, or if the place where they were originally established can be definitely determined, are conclusive, regardless of the correctness of their location.

3. SAME—PUBLIC—LANDS—PATENTS.—Where an entry of public land was made in the land office on the faith of an original government survey, the patent, when issued, related back to the date of entry, and was based on such original survey.

(Decided April 8, 1905).

APPEAL from District Court, Salt Lake County; C. W. Morse, Judge.

Action by the Washington Rock Company against Le Grand Young and another. From a judgment in favor of plaintiff, defendant Young appeals.

REVERSED.

*O. W. Moyle* for appellant.

*Sutherland, Van Cott & Allison* and *William D. Riter* for respondent.

## STATEMENT OF FACTS.

This is a controversy over a lost boundary or survey. The plaintiff is the owner of the northeast quarter of the southeast quarter, and the appellant of the northwest quarter of the southeast quarter, of section 12, township 1 south, of range 1 east, Salt Lake meridian. Along the boundary line between the two tracts is located a stone quarry, which, if the line is as claimed by the plaintiff, belongs to the rock company; if it is as claimed by the appellant, it belongs to him. The following diagram shows the location of the premises, as referred to by the evidence:

Distance from A to where original surveyor claims he set corner indicated by E is 7,920 feet. This locates quarry west of line G-H. Distance from A to where subsequent sur-

veyors replaced corner at E is 7,749 feet. This locates quarry east of line G-H.

Mr. Dickert, who made the original survey of the line in controversy, testified: "In 1881 and 1882 I made a survey of the land in question for the government, as a deputy United States surveyor. The government paid me for my services. . . . Mr. Young made an application in the surveyor general's office to have this land surveyed, covering the quarries. . . . I established the southwest corner of section 11, marked R on defendant's Exhibit A. From this I ran east, and found the rock in place at A, that must have been set by Burr. My survey came out exactly with him. . . . I ran east from A on a true line, giving each mile eighty chains. I established a mile corner at B; then from there I set every twenty chains a cedar stake about two or three inches in a pile of rocks, so as to find out where the twenty-chain post comes. We do not establish them for the government, but I established it for Mr. Young, to find out where the quarter sections were. At D I established the quarter-section corner; put a big monument there. Went twenty chains farther to T, and I set a stake. Then I established the southeast corner of section 12 at E. Each mile had eighty chains. No other survey had been made of the point E, or of any point I surveyed, except A, which was just northwest of the pesthouse. . . . From E I ran north, and established the east boundary of 12 at the corner marked F. When I came to the half-mile post, I found the country was so rough it was no use to run farther, for the purpose we run the line was to cover the quarry. The line was sufficient. I stopped at F, and made a large pile of rock, and in the neighborhood there was some large rock. I marked witness corners. I forget—it is twenty-one or two years— but my notes prove that. If they wanted to retrace the line, they could have done it by running to that corner. I established X on the north line of section 12, and from there run a half mile east between sections 12 and 1, and established Y. . . . Then, with reference to establishing the lines of this forty acres of Judge Young's, I run a line north from

a point twenty chains east of the quarter-section corner. That is the line north from F. I also run north from D to K twenty chains, and established the corner there. I also set a corner at H, then we run up north another twenty chains, and I set there a big scrub cedar or something—I don't recollect —and I gave Mr. Young a complete map of the survey and the notes. This last point was G. Then I went west twenty chains and established I. I established, therefore, K, H, G, I, and put posts at each corner, to cover the land to Judge Young. I have visited this land again lately. I was there in November or December of last year with Mr. Hardy, the surveyor. He is in court. I went along what is marked the 'wagon road' on the map. We stopped about 15 chains from the quarry. Did not walk up to the quarry. I set the posts G and H. I remember when I made the survey that there was a quarry on the west side of the line. I did not see anything on the east side. . . . It [the line] must have been twenty or thirty feet east of the quarry, and left the quarry in Judge Young's land. . . . I established point A exactly where the Burr monument was. Did not change it at all."

The official field notes of Mr. Dickert's survey, in the custody of the United States surveyor general, which were introduced in evidence, show the manner of making that survey as follows: "Survey commenced at the remains of an old mutual corner of sections 10, 11, 14 and 15, thence east on the line between sections 11 and 14 to the quarter corner, at which place a sandstone monument was set, the southeast corner of the pesthouse bearing north forty-nine and one-half degrees west five chains from the monument; thence east to the southeast corner of section 11, eighty chains from beginning, at which place a monument was set; thence farther east forty chains on the true line between section 12 and 13 to the quarter-section corner, at which place a monument was set; thence farther east forty chains to the southeast corner of section 12 on east boundary of township, at which place a red sandstone monument was set, 20x10x9 inches. From the southwest corner of section 12, Mr. Dickert went

north between sections 11 and 12 forty chains and set a red sandstone monument for a quarter-section corner; thence farther north forty chains to the northwest corner of section 12, at which place a monument was erected. The survey then proceeded west along the north side of section 11 and then from the nortwest corner of section 12 proceeds east between sections 1 and 12 forty chains to quarter corner, at which place a monument was erected. Mr. Dickert also run north forty chains from the southeast corner of section 12 to quarter corner, at which place a sandstone monument was set."

The next survey was made by Mr. Ferron in October, 1884; and, referring to the field notes in the surveyor general's office, the witness Atkinson testified: 'These notes show that from the corner of townships 1 and 2 south, range 1, and 2 east, Mr. Ferron run north on a random line between said townships to the southeast corner of section 12; finding the distance to be four miles and nineteen links, and the falling to be sixty-five links north of corner to sections 7, 12, 13, and 18. This is a mistake. It should have been east or west. I adjusted my chains and instrument to the measurements found, and ran south between sections 13 and 18. From the corner to sections 7, 12, 13, and 18, which is a sandstone 20x10x9 inches, properly marked, Mr. Ferron run north between sections 7 and 12 forty chains, and found the old quarter corner, and went still farther north forty chains to the northeast corner of section 12, and there set a sandstone monument." The same witness, reading from the official field notes of Mr. Pancake's survey, which was made in December, 1884, said: "Mr. Pancake did not find the southwest corner of section 12. He re-established it. He reached that from the south boundary of the township. From that corner he run east on a random line forty chains, and found no trace of the old corner. He then went farther east forty chains, to the southeast corner of section 12, where he found the old corner; and from this corner he returned back forty chains, and there reset the quarter corner on the south of section 12; thence back to the southwest corner of section

12, where he reset the corner which was not found. From the southwest corner of section 12 he ran north forty chains to the quarter corner. He found no corner standing, and reset it. Thence farther north forty chains to the northwest corner of section 12, where he found no trace of the old corner, and there he reset a stone monument. From this point he ran east forty chains, and found no trace of the old corner, and there he reset a quarter corner. In order to establish the southeast corner of section 11, Mr. Pancake run from the south boundary of the township four miles south. He did not find the corner there, but re-established it. . . . The north and west and south boundary of section 12 was surveyed by Pancake. The east boundary of section 12 was surveyed by Ferron." On cross-examination the witness testified: "The first survey of section 12 was made by Mr. Dickert. This survey came from the west of point A to B, then north to X, thence from B to C, then from D to E, and established the quarter corners and the section corners. He didn't establish D. As a government surveyor, he wouldn't establish that. All we establish are the section and quarter-section corners. E, W, and Y were established by Mr. Dickert in 1881. Burr's survey was in 1856. A was the only corner located by Burr. In December, 1884, Mr. Ferron made his survey, and began four miles below E, and came north to E. He found E standing. I infer he found that corner all right. It practically says so. He starts from that point, four miles south. 'I run north on a random line between said townships to the corner of sections 7, 12, 13, and 18.'"

The witness Anderson, who was employed by the plaintiff company, and made a survey of its land and the line in dispute, among other things testified: "Mr. Dickert's survey, whether correct or incorrect, would be binding if you could find the corners he put there at W and E and C. We are trying to replace his corners, and, if I started at A, through which point Mr. Dickert went, and followed his field notes, and gave the full amount for each one of these directions,

the quarry would be in Judge Young's land, and not in the Washington Rock Company's land. The corners established by Mr. Dickert, X, Y, W, E, and B, would be binding, whether or not X and Y were located exactly parallel with B and and E, and whether or not the line B and X was exactly parallel with E and W. It is often the case that section lines are not exactly parallel. If I gave all these parties their full ground, it would extend E over into another township, assuming Z is correctly on the township line. If Z is too far west, it might and might not rectify the whole length. If Mr. Dickert had put E into a new township, that would make no difference. It would be binding if we could find the stake he put there. I took the position of E entirely from Z, and assumed Z is right. When Mr. Dickert made the survey, there was no township line on the east of the quarter corner. He ran a half mile of that himself, and the land on the east of the township line was not surveyed. The township line from E to W was first established by Mr. Dickert. I made the lead pencil line on the map, which is just 171 feet east of the black line on the map. The nearest point of the quarry to this lead pencil line is forty feet, and, if that line is correct, it is all in Judge Young's land, with forty feet to spare. The stakes that were put around Judge Young's land in the beginning, if they could be found, would be binding; that is, those filed in the surveyor general's office." The witness further testified: "Either the point A or the point Z is wrong; that is, they do not agree with the notes. They both cannot be right. A should be on the ground actually a mile and a half west and a mile south of Z. It is not that distance. The two corners disagree with the call in the notes. In locating this quarry on the Washington Rock Quarry's land, and taking it away from Judge Young's land, I assume that Z is just as correct as A, although Z was not in existence at all when A was established; neither was Z in existence when B and C, E and W, were established."

It was admitted at the trial "that the homestead entry" on appellant's land "was made under soldiers' national homestead scrip May 19, 1882, and on that entry a patent was

afterwards issued to the grantors of defendant Le Grand Young, and that he is the owner of the property at this time." The witness Hardy, who recently surveyed the land in dispute, and whose survey agrees practically with that of Mr. Dickert, testified: "In making my survey, I started from A as the beginning point, and I made the distances correspond with Mr. Dickert's field notes. A to B forty chains, B to D forty chains, and I from D is forty chains; H twenty chains from K and twenty chains from G, and G twenty chains from I, also from H. G is the same distance from A as is provided in the original field notes of Mr. Dickert, according to my knowledge, and also having surveyed it. I am aware of no error in my survey. I did not find any appreciable conflict in any of the monuments that I found upon the ground, and, to my best knowledge and belief, from my survey, the position of G not only coincides with A, but with all the other stakes that I have mentioned. . . . The line G-H went on the east side of the quarry. . . . It placed the whole quarry in Judge Young's land." It is also shown that under this judgment the appellant's land is less than forty acres, while the patent calls for that number of acres.

Under this and other evidence of similar import, the jury returned a verdict in favor of the plaintiff, and, upon judgment being entered accordingly, this appeal was prosecuted.

A statement of the case as above having been made, BARTCH, C. J., delivered the opinion of the court as follows:

The decisive question in this case is whether at the close of the evidence the court erred in refusing to instruct the jury to return a verdict in favor of the appellant. We understand the contention of the appellant to be that there is no conflict in the evidence as to the material facts which must control in this controversy, that the law applicable to those facts gives him an undoubted right to the thing in dispute, and that therefore the question involved was one of law for the court. A careful examination of the evidence shows this contention to be well founded. More than thirty years

ago, as appears by the proof, the patentee made application to the land office to have the land in dispute surveyed, and thereupon Mr. Dickert, as deputy United States mineral surveyor, was instructed by the surveyor general to make the survey. Pursuant to such instructions, Mr. Dickert surveyed all the lines and set all the corner monuments necessary to segregate the land referred to by the application from the public domain. That is admittedly the original survey, in so far as the land in controversy is concerned. After doing some preliminary surveying, he found a rock monument at point A, a quarter-section corner previously set by Mr. Burr. From this point he ran east on a true line, giving each mile eighty chains, and established the southeast corner of section 11 at B, the quarter-section corner at C, and the southeast corner of section 12 at E, which section embraces the land in question. He also established the corners at F, X, and Y, and all the intermediate corners, including K, H, I, and G, but he did not establish the corner at Z. All these corners are represented on the diagram appearing in the statement of facts. At this time the township line on the east side of section 12 had not yet been surveyed. On this survey the entry of the appellant's land was made and the patent issued, and it included the land upon which the stone quarry is located. About two years later Mr. Ferron made a survey of the eastboundary line of section 12. He commenced his survey from a point about four miles below E, and ran a random line north to E; but whether or not he found the monument set at E by Mr. Dickert does not satisfactorily appear from the evidence, which simply shows that he ran a line between certain "townships to the corner of sections 7, 12, 13, and 18," without direct reference to a monument. From point E, to which he so ran, he proceeded north to W, and thence north, and established the northeast corner of section 12 at Z. Some time later Mr. Pancake made his survey of the north, west, and south boundaries of section 12. In order to re-establish the lost corner at B, the southwest corner of section 12, he also began the survey at a point four miles south on the south boundary of the township,

and then from B proceeded to re-establish the other lost
corners and lines necessary to locate the appellant's land.  In
establishing the lost corners and lines, as will be observed,
neither Mr. Ferron nor Mr. Pancake followed the survey of
Mr. Dickert.  They evidently paid no attention to the corner
at point A, although the monument at that corner remains
still at the place where it was set by the original survey.
Instead of retracing the original survey from an original
known corner with the aid of the field notes, they chose to
commence at a point in an entirely different direction from
E, four miles therefrom, and then from such point, disre-
garding almost wholly the original survey, attempted to re-
establish the lost corners and lines.  The lost monuments thus
re-established, it appears, controlled in the survey of Mr. An-
derson, the respondent's surveyor, whereby the stone quarry
in dispute was transferred from the appellant's land to that
of the respondent by locating the boundary line between the
two tracts on the west side of the quarry.  The corner at Z,
though not established until several years after the original
survey was made, he assumed to be correct, instead of the
one at A, and thus made the survey, with the result indi-
cated.  He says, "Either the point A or Z is wrong," and as-
sumes A to be wrong, although the corner at A was estab-
lished by the first survey, and yet remains in the same place.
By doing so, he not only disregarded point A, the solemn
witness of the original survey, but also the field notes, which
show the courses and distances of that survey from that cor-
ner, in violation of the principle that, where the monuments
and lines of an original survey are lost, the field notes of
such survey, and the courses and distances shown by them,
may be resorted to, as the best evidence remaining, in re-
establishing such monuments and lines.  The fact, if it be a
fact, that, if the Dickert survey be retraced by aid of the
courses and distances given in the field notes, it places the
corner at E, some distance east of the township line, into an-
other township, can make no difference, under the circum-
stances disclosed by the proof respecting lost corners and
lines.  Such fact, if it be a fact, cannot injuriously affect the

rights of the appellant acquired by entry based upon a survey made before the township line was located. If by the original survey the corner at E was set east of where the township line was afterwards located, subsequent surveyors had no right to place it anywhere else. The law is well settled that an original survey of lands, upon the faith of which property rights have been based and acquired, controls over surveys subsequently made which injuriously affects such rights.

The witness Anderson admits the binding effect of an original survey, and yet in practice he disregarded the very evidence which would admittedly have enabled him to re-establish the lost lines and corners without interference with property rights acquired on the faith of an original authorized goverment survey, for he admitted in his testimony that if he had commenced his survey at point A, and followed the field notes of Mr. Dickert, the quarry would be in the appellant's land. That this is true is clear from the survey of Mr. Hardy, who started from point A, and recognized the field notes of the Dickert survey. His survey appears to be a compliance with the rules of law governing such a case. Where the monuments of corners, which, if standing, would fix the boundaries of a tract of land, are lost, as in this instance, but the corner monument, from which the initial survey was made, remains intact, such monument, in the absence of other controlling evidence of the original survey which will protect the property rights acquired on the faith of that survey, and which will be more likely to restore the original lines and monuments, should be resorted to and adopted as the beginning point of subsequent surveys of the same tract of land. From that point the original survey should be retraced, and the monuments re-established, with the aid of the courses and distances contained in the field notes of the first survey.

"Original corners, as established by the government surveyors, if they can be found, or the places where they were originally established, if they can be definitely determined, are conclusive, without re-

gard to whether they were located correctly or not."
(5 Cyc., 873.)

In reference to the powers and duties of commissioners and processioners under appointment to establish lost boundaries, it is said:

> "The powers of commissioners and processioners extend only to locating and establishing lost or doubtful boundaries, and they can in no event disturb title or rights of possession or establish new lines. In doing this they must follow the mode prescribed by the order or decree of appointment, and from a known and established corner or monument should run out the lines by course and distance according to their original location. They are at liberty, however, to survey whatever lines may be necessary in order to find and establish the true location of the line in dispute." (5 Cyc., 946; *Martz v. Williams,* 67 Ill. 306.)

This applies with equal force to subsequent surveyors appointed to re-establish lost lines and corners. Such surveyors may also, in all cases of this character, consider other extrinsic material evidence, as well as the field notes, for the purpose of determining the exact location of the lost lines and corners of the original survey; and, wherever corner monuments of that survey can be found in place, they must control over the courses and distances indicated by the field notes, and over any other calls in such notes. This is a binding rule. But "before the rule that monuments control courses and distances can apply, there must be actual, fixed monuments, and the places where they were at the time the deed was made must be determined." (4 Am. and Eng. Enc. Law, 769.) In *Hess v. Meyer,* 73 Mich. 259, 41 N. W. 422, it was said:

> "If the stakes or monuments placed by the government, in making the survey, to indicate the section corners and quarter posts, can be found, or

the places where they originally were placed can be identified, they are to control in all cases. When they cannot be found, or if lost or obliterated, they must be restored upon the best evidence obtainable which tends to prove where they originally were. For this purpose surveys are made, and the lines retraced as near as possible."

In such cases junior or subsequent surveys are not made to dispute the correctness of or to control the original survey, but to furnish legitimate proof of where the lost lines or monuments were, so as to aid the jury in determining the exact location of the original survey. It seems clear, therefore, that in making such junior surveys the original survey should be retraced, when possible. In this instance there appears to be disclosed by the record no good reason why the subsequent surveyors disregarded point A and the field notes, went over four miles from point E for a starting point, and made practically a new survey, instead of retracing the old one. An original survey, upon which property rights have been acquired, cannot thus be changed or diminished or obliterated, with so little regard for existing evidence. In *Clement v. Packer,* 125 U. S. 309, 8 Sup. Ct. 907, 31 L. Ed. 721, it was said:

"It is unquestionably true that a junior survey cannot control or enlarge the dimensions of a senior survey. We understand this to mean that, when the location of a survey is or can be ascertained or determined by its own marks upon the ground—its own calls and courses and distances—it cannot be changed or controlled or enlarged or diminished by the marks or lines of an adjoining junior survey; but when, from the dissappearance of these original landmarks, caused by time and other agencies, from the senior survey, the location of a particular line or the identity of a corner is left in uncertainty or becomes the subject of controversy, then the original

and well-established marks found upon a later survey made by the same surveyor about the same time, and adjoining the one in dispute, are regarded as legitimate evidence, not to contest or control, but to elucidate, throw light upon, and thus aid the jury in discovering the exact location of the older survey."

(1 Dembitz, Land Titles, sec. 4; 5 Cyc., 874, 875; A Am. and Eng. Enc. Law, 787; *Goodman v. Myrick,* 5 Or. 65; *Payne v. English,* 79 Cal. 540, 21 Pac. 952; *Irvin v. Rotramel,* 68 Ill. 11; *Clement v. Northumberland Coal Co.,* 87 Pa. 291; *Hubbard v. Dusy,* 80 Cal. 281, 22 Pac. 214; *Nesselroad v. Parrish* [Iowa], 13 N. W. 746; *Billingsley v. Bates,* 30 Ala. 376, 68 Am. Dec. 126.)

The fact that the date of the appellant's patent is not in evidence does not militate against the position that it was based upon, and issued with reference to, the original survey. The entry was made in the land office upon the faith of that survey, and when the patent was issued it related back to the date of the entry. A patent granted by the United States is always preceded by a survey, and is understood to refer to the lines actually run on the ground. (1 Dembits, Land Titles, sec. 4; *Flint & P. M. Ry. Co. v. Gordon,* 41 Mich. 420, 2 N. W. 648; *Lessee of French v. Spencer,* 21 How. (U. S.) 228, 15 L. Ed. 97; *Shepley v. Cowan,* 91 U. S. 330, 23 L. Ed. 424; *Stark v. Starr,* 6 Wall, 402, 18 L. Ed. 925.)

Having thus concluded that the court, under the facts in evidence, ought to have instructed the jury to return a verdict in favor of the appellant, it is unnecessary to decide any other question presented.

The case must be reversed, with costs, and remanded for further proceedings in accordance herewith. It is so ordered.

McCARTY, J., concurs.

STRAUP, J. (concurring).

I concur in the reversal of the judgment, but I do not concur upon the ground that the trial court was authorized to direct a verdict.

Point A on the plat in the opinion of the majority court was established by Burr, deputy United States surveyor, in 1856, when making a partial survey of section 11. In 1881 Dickert, deputy United States surveyor, made a partial survey of section 12, and established point E on the township line as the southeast corner of section 12, and one-half mile north thereof, on the township line, established point F. Then running north from point C and D he established points G, H, I, and K, marking the boundary between the quarter-sections in dispute. Monuments were placed by him at all these points. In 1884 Ferron, deputy United States surveyor, made a survey starting on the township line "four miles below point E, and came north to E, which monument he found still standing. Running due north from E one-half mile, he found monument F standing, and ran due north another one-half mile, and established monument Z." Still later, but in 1884, Pancake, deputy United States surveyor, surveyed and established the north, west, and south boundaries of section 12. He also found monument E, established by Dickert, but did not find C, B, or A, and so re-established them. He did not find M, X, or Y, and established those; but he did find Z, established by Ferron. So that we have monument E placed and established by Dickert as the southeast corner of section 12, found by both Ferron and Pancake, and "the corner Z was set from the corner set by Mr. Dickert; that is, he (Ferron) started at the point E, and ran due north one mile and set the corner Z." Not only is there evidence to show that the two corners, Z and A, disagree with the calls in the notes, but also that A or E is wrong. E was supposed to be placed by Dickert on the township line, just where it was found by both Ferron and Pancake; but, taking A as the controlling point, and going one and one-half miles east of A, the east boundary line of section 12 would be 171 feet in another township.

All the monuments except A, X, and Z are obliterated.

The ultimate fact sought to be established at the trial was, where had Dickert placed the monuments, all of which are obliterated, marking the boundary between the quarter-sections in dispute? It is conceded, and it is the law, that wherever he placed them, that became the actual boundary line, no matter whether it was accurate or not. But the majority court, in effect, have held that the finding of the lost monuments marking such boundary is to be determined by starting at the pont A, where Dickert started, and, by following the course and distance of his field notes, the lost monuments should be established at whatever place these notes lead. In other words, the majority court, in effect, have declared not only that the field notes of the original survey are competent evidence to establish lost monuments, which I concede, but that they are conclusive evidence thereon, which I do not concede, but with which I disagree. There is no case cited holding that the field notes of the original survey are conclusive evidence to establish lost monuments. What courts have said is, wherever the corners were placed by the original government survey, that must govern as the boundary line, no matter whether accurate or not, and cannot be altered or controlled by subsequent surveys. When, however, the corners become lost or the monuments obliterated, the cases are quite harmonious that:

> "It is for the jury to ascertain and settle at what precise point the disputed or lost corner was placed, and the disputed line marked, by the government surveyor in his original survey. And to enable the jury to perform that duty intelligently, any evidence, whether parol or written, may be submitted to them, which has any natural and reasonable tendency to show where that corner was placed or that line marked in the original survey. Recourse may be had to the unobliterated marks and corners of that survey, to the field notes and plat, and to subsequent surveys made under their guidance. Such subsequent surveys cannot alter or control that survey, for, so far as it can be traced or proved, it

must govern. But still they may aid the jury in ascertaining the original position of the lost corner. With their aid the jury may be enabled to ascertain with reasonable certainty where the lost corner was located in the original survey. Without their aid the jury may not be able to ascertain that location. Their weight or influence as evidence must be determined by the jury. The mere fact that the party relying on them has not proved that they correspond in all respects with the original government survey does not authorize the court to instruct the jury to disregard them entirely in seeking the location of the lost corner or line. The party cannot in any case prove such correspondent without proving every part of that survey. In many cases he cannot prove a lost corner, or any other lost part of the survey, without the aid of such subsequent surveys. And in all such cases a rule which requires, as a condition for obtaining any influence for them, that the party relying on them should prove their correspondence in all respects with the original survey, would amount to a denial of the right to prove the location of a lost corner or other lost part of the original survey. There is no such rule. . . . The jury ought to consider such subsequent surveys in connection with the other evidence in the cause, and if, after doing so, they believe that the original location of the lost corner was at a particular point, designated with reasonable certainty by the evidence, such belief ought not to be disregarded in making up their verdict." (*Billingsley v. Bates,* 30 Ala. 376, 68 Am. Dec. 126.)

When the cases cited by the majority court are read, the above is all that is maintained by them. The error of the majority court in holding that the only and conclusive procedure to establish lost corners is to retrace the lines of the original survey is fully pointed out and answered by the following cases: *Moreland v. Page,* 2 Iowa 139 (vol. 2,

Cole's Ed.); *McClintock v. Rogers,* 11 Ill. 279; *Martz v. Williams,* 67 Ill. 306; *Miller v. Topeka Land Co.* (Kan.), 24 Pac. 420. The rule of law as recognized by these cases, as well as by the cases cited by the majority court, is to the effect that, where corners become lost or monuments obliterated, boundaries may be proved not only by field notes, but by surveys, records, and certificates, maps and plats, testimony of witnesses, and other evidence admissible to establish the controverted fact, not for the purpose of altering or correcting the original survey as made, but for the purpose of determining where, as a matter of fact, the monuments were originally placed by the original government survey; and the determination of this fact is one for the jury, under proper instructions from the court. (5 Cyc., 956-972.)

Here there was evidence to show that point Z was established one mile due north from the point E, as established by Dickert—the so-called original survey. Monument E is now gone. The question is, where was it originally placed by Dickert, The majority court say the only and conclusive way to determine such fact is to start at the point A, where Dickert started, and run east one and one-half miles. But inasmuch as Z was run one mile due north from E, as established by Dickert, why is it not evidence proving where E originally was by running one mile due south from Z, which still stands, and is a witness as to where E was? And starting from the point Z, or starting from the point E, the rock quarry in dispute would be in the quarter section owned by respondent. And according to the surveys made by Ferron, Pancake, and Anderson, and evidence of other witnesses, the lost monuments, as established by the original survey, would have been found at such place as to give the rock quarry to the respondent. It may be that this evidence was not so convincing and was not of so great a weight as was the evidence retracing the field notes of the original survey. But as the authorities say, this was mere matter of weight for the jury. Suppose it had been shown by oral testimony from persons who saw placed the original monuments (now obliterated), or who saw them thereafter in place, and were

able to identify the exact place; could it be said that such evidence cannot be considered to determine where the monuments were originally placed, but that it must give way to wherever the field notes of the original survey by course and distance would place the monuments? Here it is not claimed or pretended that the surveys and the evidence of respondent's witnesses was not competent evidence tending to prove where the lost monuments were originally placed. And if it was competent evidence, and tended to prove, as it did, that the rock quarry was in the quarter-section of respondent, on what principle of law shall it now be declared that the trial court should have wholly disregarded such evidence, and directed a verdict for appellant? The only answer to it is that the field notes of the original survey are conclusive, and that the lost monuments should have been established by starting at point A, where Dickert started, and following to whatever point or points the notes, in their course and distance, lead, and that all other evidence of a different nature proving lost monuments and establishing boundary is incompetent.

I am, however, of the opinion that the court erred in refusing to give appellant's request No. 4, which is as follows: "You are instructed that if you find from the evidence that the original corners of section 12, as made by the surveyor, Mr. Dickert, have been torn down or destroyed, or cannot now be found, then it is your duty to ascertain from the evidence, as nearly as possible, where the said original lines and corners were that are in dispute, and it makes no difference whether or not said original lines and corners are exactly where they should have been if the survey had been perfectly made." The following charge, which the court gave, was not the substance of said request: "You are instructed that the true corners and boundary lines of townships, sections, and subdivisions of sections are where the government surveyors in fact established them on the ground. Evidence of surveys made by various civil engineers has been introduced in this case. Such evidence was admitted for the purpose of assisting you in determining the true location of

the boundary line in dispute, and it is your duty to determine from all the evidence where the line between the northeast quarter of the southeast quarter and the northwest quarter of the southeast quarter of section 12 is located upon the ground according to the government survey, and in which of said forty-acre tracts the stone quarry in controversy is located." The evidence shows that there was several government surveys made by several different government surveyors at different times. The instruction states that "the true corners and boundary lines," etc., "are where the government surveyors in fact established them on the ground." At the time of and by the original survey, or at some subsequent time, and by another survey? The phrases "government surveyors" and "according to the government survey" are not sufficiently specific in this regard. By this charge the attention of the jury was not sufficiently directed to the fact, as was done by the request, that the lines and corners, as originally made and placed, must control, whether accurate or not.