2004 SD 106

**Stacey & Marilyn TITUS, Plaintiffs
and Appellees,**

v.

**Sandra CHAPMAN, Defendant
and Appellant.**

No. 23116.

Supreme Court of South Dakota.

Considered on Briefs Aug. 23, 2004.

Decided Sept. 22, 2004.

Courtney R. Clayborne of Johnson Eiesland Law Firm, Rapid City, South Dakota, Attorneys for plaintiffs and appellees.

James W. Olson of Wilson, Olson & Nash, Rapid City, South Dakota, Attorneys for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] Stacey and Marilyn Titus filed suit against Sandra Chapman to determine the boundary between their adjoining lots located in Pennington County, South Dakota. Both parties agreed on the proper legal boundary line, but differed as to its location based on competing surveys. Following a hearing on opposing motions for summary judgment, the trial court granted Tituses' motion. The trial court also held Chapman did not establish a claim of adverse possession. The trial court did not grant Chapman's motion to join necessary parties. Chapman appeals all three issues. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] The land in dispute is located in rural Pennington County, South Dakota. In 2001, Tituses purchased a parcel of land commonly known as Lot A, located in the Northwest Quarter of the Southeast Quarter, Section 12, Township One North, Range Six East of the Black Hills Meridian. The land was unoccupied at the time the law suit was filed.

[¶ 3.] On July 5, 1989, Chapman purchased the property commonly known as Lot 2, located in the Northeast Quarter of the Southeast Quarter, Section 12, Township One North, Range Six East of the Black Hills Meridian. Throughout her ownership of the land, Chapman has maintained a mobile home on the property. Prior to Chapman's ownership of Lot 2, the property was unoccupied, unenclosed by a substantial fence or other natural barrier, and uncultivated.

[¶ 4.] The two lots have a common property line both parties agreed is the 1/16th section line of Section 12. Surveys of the area indicated the Chapman lot's western edge terminated at the 1/16th section line, while the Tituses lot's eastern edge terminated at the 1/16th section line. However, competing surveys indicated two different locations for the 1/16th section line. The dispute centered on a 34 foot strip of land claimed by both parties, and upon which Chapman had located a mobile home, cistern and portions of an old fence that never substantially enclosed the property.

[¶ 5.] The U.S. Forest Service originally surveyed the area in question in April of 1879 and August of 1886. The survey resulted in a plat of Section 12, Township One North, Range Six East of the Black Hills Meridian. The general practice at the time was to locate artificial or natural monuments to indicate section corners and quarter section corners.[1]

[¶ 6.] Section 12 was next surveyed in 1946 by Stein Bangs for the purpose of subdividing the Northwest Quarter of the

1. In surveying and subdividing townships, government surveyors were required to establish section corners by "a mound, four pits and a stake; and a quarter section corner by a mound, two pits and a stake or post; the stakes or posts to be properly marked, to indicate the corner represented." *Randall v.*

*Burk Tp. of Minnehaha County*, 4 S.D. 337, 351, 57 N.W. 4, 9 (1893).
"Visible marks or indications left on natural or other objects indicating the lines and boundaries of a survey, are monuments. They include posts, pillers, [sic] stone markers, cairns, fixed natural objects[,] blazed trees and watercourses. Any natural or

Southeast Quarter of Section 12, together with other property. The Bangs survey platted Lot A of the Northwest Quarter of Southeast Quarter of Section 12 with an eastern boundary collinear with the 1/16th line of Section 12. The eastern boundary of Lot A was not monumented by Bangs. However, the Bangs survey indicated an artificial monument, an iron pin, on the southern portion of the 1/16th line of Section 12 at the southern quarter corner between the Southwest Quarter of the Southeast Quarter and the Southeast Quarter of the Southeast Quarter. The record is unclear if Bangs set the iron pin, or merely located it when conducting his survey.

[¶ 7.] A third survey of the area was conducted in October of 1970 by Stuart Ferguson for the purpose of further subdividing the Northeast Quarter of the Southeast Quarter of Section 12 into Tracts A, B, and C. The Chapman lot was not platted at the time, but was eventually to be further subdivided in 1983 from Tract B. The western boundary of Tract B was intended to terminate at the 1/16th section line according to the Ferguson survey.

[¶ 8.] However, Ferguson did not follow the original U.S. Forest Service Black Hills monuments to determine the original location of the 1/16th line. Instead, Ferguson located an iron pin or pipe without a surveyor's cap at the southwest corner of Tract C. Ferguson assumed the iron pipe was the same pin indicated on the Bangs survey as the 1/16th line. There were no facts to indicate the origins of the iron pin, or to identify it as denoting the original 1/16th section as located by the U.S. Forest Service survey. Despite the absence

of clear and convincing evidence as to the identity of the pin, Ferguson accepted it as the 1/16th line and conducted measurements to locate the western edge of Tract B, which would eventually become the western edge of Lot 2. Ferguson indicated he marked the other three corners of Tract B with 5/8th inch rebar. The end result was the addition of approximately 34 feet to Tract B on its western boundary.

[¶ 9.] On April 18, 1983, a plat subdividing Tract B into lots, including Lot 2 which was eventually purchased by Chapman, was filed by surveyor David Landguth. Landguth relied on the Ferguson survey and set the western edge of Lot 2 at the 1/16th section line. However, the 1/16th section line was platted at the same location as the Ferguson survey rather than the original location as designated by the U.S. Forest Service survey. Landguth then marked the western boundary corners of Lot 2 with 5/8th inch rebar.

[¶ 10.] Following their purchase of Lot A in 2001, Tituses commissioned a survey of their property prior to beginning construction of a new home. The survey, conducted by Dean Scott, retraced the original footsteps of the U.S. Forest Service survey and called upon the three remaining original corner stones placed around the perimeter of Section 12 by the U.S. Forest Service in 1879 and 1886, which monumented the southeast, southwest and northwest corners of Section 12. Instead of using the iron pin of unknown origin as the location of the 1/16th section line as had Ferguson and Landguth before him, Scott attempted to locate the missing northeast corner stone in order to properly divide Section 12 in its entirety by aliquot

artificial physical object on the ground which helps establish the location of a line is a monument." *Block v. Howell,* 346

N.W.2d 441, 444 n1 (SD 1984) (citing Black's Law Dictionary 909 (1979)).

portions to arrive at the original location of the 1/16th section line as required by the Manual of Instructions for the Survey of Public Lands of the United States.

[¶ 11.] When Scott was unable to ascertain the exact location of the northeast corner due to the obliteration of the monument, he extended his survey out one additional mile north from the vicinity of the missing northeast corner stone to a replacement monument located at the northeast corner of adjoining Section 1 placed by the U.S. Forest Service surveyors. Using methods prescribed by the Manual of Instructions for the Survey of the Public Lands of the United States, the location of the northeast corner of Section 12 was computed. Once the complete exterior boundary of Section 12 was determined, Scott properly computed the aliquot divisions to arrive at the original location of the 16th section line as intended by the U.S. Forest Survey.

[¶ 12.] Tituses moved for summary judgment, and the trial court granted the motion. By order the trial court established the 1/16th line as originally set by the U.S. Forest Service as the property line common to Tituses and Chapman. The trial court also entered an order denying Chapman's motion for summary judgment on the issue of adverse possession. The trial court held the markings used to establish Chapman's property line were not open, visible, notorious, continuous or hostile occupation of the property, and in the alternative, Chapman had not been in possession of the property for 20 years as required by statute. Chapman's motion to join necessary parties was also denied by the trial court.

## STANDARD OF REVIEW

[¶ 13.] Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15–6–56(c). We will affirm when no genuine issues of material fact exist, and the legal questions have been correctly decided. *Holzer v. Dakota Speedway*, 2000 SD 65, ¶ 8, 610 N.W.2d 787, 791 (citing *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987)). All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990) (additional citations omitted). The burden is on the moving party to clearly show the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Id.* Conclusions of law are reviewed under a de novo standard, giving no deference to the circuit court's conclusions of law. *Sherburn v. Patterson Farms, Inc.*, 1999 SD 47, ¶ 4, 593 N.W.2d 414, 416 (citing *City of Colton v. Schwebach*, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771).

[¶ 14.] The ultimate conclusion of whether the facts are sufficient to constitute adverse possession is a question of law. *City of Deadwood v. Summit, Inc.*, 2000 SD 29, ¶ 9, 607 N.W.2d 22, 25. Conclusions of law are reviewed under the de novo standard for which this Court gives no deference to the circuit court. *Sherburn*, 1999 SD 47, ¶ 4, 593 N.W.2d at 416 (additional citations omitted).

[¶ 15.] A party's status as an indispensable party is a conclusion of law. *See Thieman v. Bohman*, 2002 SD 52, ¶ 14, 645 N.W.2d 260, 262. As such, a trial judge has no discretion whether to join an indispensable party, as the language of SDCL 15–6–19(a) is mandatory. *Smith v.*

*Albrecht,* 361 N.W.2d 626, 628 (S.D.1985) (citing *Kapp v. Hansen,* 79 S.D. 279, 286, 111 N.W.2d 333, 337 (S.D.1961)). As a conclusion of law it is reviewed by this Court de novo, giving no deference to the circuit court. *Sherburn,* 1999 SD 47, ¶ 4, 593 N.W.2d at 416 (citations omitted).

## ANALYSIS AND DECISION

[¶ 16.] **1. Whether the trial court erred when it established the boundary line as the 1/16th line set by the U.S. Forest Service.**

[¶ 17.] Government surveys, not surveys conducted by private individuals, create, rather than merely identify, boundaries. *Cox v. Hart,* 260 U.S. 427, 436, 43 S.Ct. 154, 157, 67 L.Ed. 332, 337 (1922). The term "original survey" refers to the official government survey performed under the laws of the federal government by its official agency. *See Id.; Block v. Howell,* 346 N.W.2d 441, 444–45 (S.D.1984); Walter G. Robillard & Lane J. Bouman, Clark on Surveying and Boundaries § 4.12 (5th ed 1976).

[¶ 18.] A subsequent survey by a private individual or non-government entity is more accurately described as a retracing or resurvey. *Block,* 346 N.W.2d at 444; *Randall v. Burk Tp.,* 4 S.D. 337, 347, 57 N.W. 4, 10 (1893). In a retracing or resurvey, a surveyor must "take care to observe and follow the boundaries and monuments as run and marked by the original survey." *Block,* 346 N.W.2d at 444. Boundaries as established by original government surveys are unchangeable and must control disputes. *Christianson v. Daneville Tp.,* 61 S.D. 55, 58, 246 N.W. 101, 102 (1932).

[¶ 19.] Original monuments, those located by the original surveyor,

mark true corners. *Lawson v. Viola Tp.,* 50 S.D. 555, 557–558, 210 N.W. 979, 980 (1926). "Where the location of the original monument can be found, or can be established by evidence, such location shall be held to be the true corner, regardless of the fact that resurveys may show that it should have been located elsewhere." *Id.* (citing *Byrne v. McKeachie,* 34 S.D. 589, 149 N.W. 552 (1914); *Hoekman v. Iowa Civil Township,* 28 S.D. 206, 132 N.W. 1004 (1911); *Randall,* 4 S.D. 337, 57 N.W. 4; *Beardsley v. Crane,* 52 Minn. 537, 54 N.W. 740 (1893); *Ogilvie v. Copeland,* 145 Ill. 98, 33 N.E. 1085 (1893); *Nesselroad v. Parrish,* 59 Iowa 570, 13 N.W. 746 (1882). Where the original monument is obliterated, that is it cannot be located nor established by evidence, then a corner can be established by a new survey. *Lawson,* 50 S.D. at 558, 210 N.W. at 980 (citing *Randall,* 4 S.D. at 355, 57 N.W. at 10; *Washington Rock Co. v. Young,* 29 Utah 108, 80 P. 382 (1905)). Only upon obliteration of an original corner may a new survey be made from points that can be determined in accordance with the original surveyors field notes. *Id.* However, if the point at which an original monument was located can be ascertained by the court, the line as indicated by the government survey prevails. *Dowdle v. Cornue,* 9 S.D. 126, 127, 68 N.W. 194, 194–195 (1896).

[¶ 20.] SDCL 43–18–7 provides:

In retracing lines or making the survey the surveyor shall take care to observe and follow the boundaries and monuments as run and marked by the original survey, but shall not give undue weight to partial and doubtful evidence or appearances of monuments, the recognition of which shall require the presumption of marked errors in the original survey, and he shall note an exact description of such apparent monuments.

[¶ 21.] The 1970 Ferguson survey located an iron pipe or pin without a survey cap. The surveyor assumed the pin indicated the 1/16th section line as intended by the U.S. Forest Service. The Ferguson survey failed to "walk in the footsteps" of the original surveyor in order to obtain clear and convincing evidence of the identity of the iron pipe as the 1/16th line based on its location in relation to the true section corners established by the original government survey. Instead, Ferguson conducted some retracing of the original corners of Section 12 in the field, but the majority of the measurements were calculated on paper and based on the location of the iron pin or pipe which Ferguson assumed denoted the location of the 1/16th section line. The subsequent surveys relied upon by Chapman and her predecessors in interest all relied on the same erroneous assumption utilized by Ferguson in 1970.

[¶ 22.] The Tituses survey conducted in 2002 did "walk in the footsteps" of the original government surveyor. The Tituses surveyor, Scott, located three original corner monuments, and retraced the original U.S. Forest Service survey in order to ascertain the location of the final missing corner monument and accurately determine the exterior perimeter of Section 12. Scott then properly computed the aliquot divisions, including the 1/16th section line, in compliance with the Manual of Instructions for the Survey of the Public Lands of the United States.

[¶ 23.] Chapman contends Tituses were required to use the Ferguson survey in order to determine the boundary line. Their argument relies on the term "original survey" in SDCL 43–18–7 as indicating the first survey to plat the tracts from which Chapman's Lot 2 was subdivid-

ed. Reliance on the 1970 Ferguson retracing is fatal to Chapman's claim. The "original survey" in SDCL 43–18–7 refers to the original U.S. Forest Service survey conducted in the 1800s, not the first private survey to plat the subdivision of the tracts in question.

[¶ 24.] The record indicates that Tituses survey complied with the requirements of SDCL 43–18–7 in that it retraced the footsteps of the original government surveyor. Conversely, the record indicates that Chapman's surveys did not follow the requirements for retracing an original survey.

[¶ 25.] There are no disputed questions of material fact. Thus, the choice of selecting between the two differing sets of surveys is a question of law. For the reasons set forth above we conclude the trial court made the correct decision. Tituses were entitled to judgment as a matter of law.

[¶ 26.] **2. Whether the trial court erred when it denied Chapman's motion for summary judgment on the issue of adverse possession.**

[¶ 27.] The record owner of disputed property is presumed to have been possessed of the property within the time presumed by law unless adverse possession is proven. *Cuka v. Jamesville Hutterian Mut. Soc.,* 294 N.W.2d 419, 421 (S.D.1980). To establish title by adverse possession, the claimant must be in actual, open, visible, notorious, continuous and hostile occupation for the statutory period. *Lewis v. Moorhead,* 522 N.W.2d 1, 3 (S.D. 1994). Although the statutory period for adverse possession is 20 years under SDCL 15–3–1, tacking allows a party to add its own claim to that of previous adverse possessors in interest, and under

whom the party claims a right of posses-sion.[2] *Estate of Billings v. Deadwood Congregation of Jehovah Witnesses,* 506 N.W.2d 138, 141 (S.D.1993) (citing *Walker v. Sorenson,* 64 S.D. 143, 148, 265 N.W. 589, 591 (1936)).

[¶ 28.] The burden of proving adverse possession by clear and convincing evidence is upon the party asserting the claim. *Summit, Inc.,* 2000 SD 29, ¶ 15, 607 N.W.2d at 26 (citations omitted). The party asserting a claim under SDCL 15–3–12 must engage in "actual, open, visible, notorious, continuous and hostile" occupa-tion of the property for the statutory peri-od. *Id.* (citations omitted). Occupation must rise to the level of a substantial enclosure or usual cultivation or improve-ment. *Schultz v. Dew,* 1997 SD 72, ¶ 12, 564 N.W.2d 320, 323.

[¶ 29.] Chapman argues her adverse possession claim is by virtue of a claim of title under SDCL 15–3–1. Chapman fur-ther contends the 20 year statutory period was satisfied by virtue of the Ferguson survey of 1970 and the resurvey and subdi-vision in the Landguth survey of 1983, which both predate the filing of the cur-rent action by Tituses in 2003. Chapman argues the filing of the plat as surveyed in 1970 and the placement of 5/8th inch rebar corner markers by Ferguson the same year on the western boundaries of what was at that time Tract B, constituted open, visible and notorious occupation for the requisite 20 year period.

[¶ 30.] The trial court concluded the markings used to establish Chapman's property line were insufficient evidence of actual, open, visible, notorious, continuous and hostile occupation for the statutory period. Alternatively, the trial court con-cluded Chapman was not in possession of the property for 20 years, as Tituses granted permissive use of the property on January 18, 2003.

[¶ 31.] We are convinced the uncontest-ed facts as presented in the record are insufficient to constitute adverse posses-sion, and Tituses are entitled to judgment as a matter of law. Chapman did not own the property until 1989, and the property itself was not platted as an individual lot until April 18, 1983 by Landguth. Addi-tionally, the plat noted the 1/16th section line as the western boundary. Despite indicating the location of the 1/16th section line by the iron pin found by Ferguson, there were no other markings to denote actual, open, visible, notorious, continuous and hostile occupation as required by SDCL 15–3–12 until 1989 when Chapman located her mobile home on the property.

[¶ 32.] We agree the iron rebar markers were insufficient to constitute an enclosure within the meaning of SDCL 15–3–13. An enclosure need not be absolutely secure to satisfy the "substantial enclo-sure" statutory requirement. *Schultz,* 1997 SD 72, ¶ 13, 564 N.W.2d at 323. While we have held a fence or natural barrier such as a tree line is sufficient, we have never held something as meager as two 5/8th inch iron rebar denoting lot cor-ners as sufficient to satisfy the enclosure requirement under a claim of adverse pos-session. *See Schultz,* 1997 SD 72, ¶ 13, 564 N.W.2d at 323 (holding a tree line along a driveway was sufficient to constitute an

---

2. SDCL 15–3–1 provides:
   No action for the recovery of real property, or for the recovery of the possession there-of, shall be maintained unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within twenty years before the commencement of such action.

enclosure within the meaning of the statute). We decline the invitation to do so today.

**[¶ 33.] 3. Whether the trial court erred when it denied Chapman's motion to join necessary parties.**

■■■ [¶ 34.] Chapman contends the trial court's failure to join the owners of Tract B and C as necessary parties requires this Court to set aside the motion for summary judgment and order the trial court to join the owners of Tracts B and C as necessary parties to the litigation. Chapman argues the issue of the western boundary line between the Chapman and the Tituses lots cannot be determined without joinder of the adjacent lot owners who also use the 1/16th line as their western boundary line. In the alternative, Chapman argues that determining the common boundary line between the Tituses and Chapman lots would impair the ability of the adjacent Tract B and C owners to protect their respective interests in the 34 foot section in dispute between Tituses and Chapman. We address the issue as a contention that the adjoining landowners were indispensable parties to the litigation.

[¶ 35.] SDCL 15–6–19(a) provides in relevant part:

A person who is subject to service of process shall be joined as a party in the action if: (1) In his absence complete relief cannot be accorded among those already parties; or (2) He claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring

double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

■■■ [¶ 36.] The determination of whether or not a person is an indispensable party is one which must be made on a case-by-case basis and is dependent upon the facts and circumstances of each case. *Provident Tradesmens Bank Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S.Ct. 733, 743, 19 L.Ed.2d 936, 950 (1968). Persons who might conceivably have an interest in the outcome of litigation are not to be considered indispensable parties. *Kapp*, 79 S.D. at 286, 111 N.W.2d at 337 (citation omitted). "The proper remedy for failure to join parties is the joinder of the parties, and not dismissal of the lawsuit, so long as it is possible to join the parties." *Agar School District No. 58–1 Bd. of Educ., Agar, S.D. v. McGee*, 527 N.W.2d 282, 287 (S.D.1995) (quoting *Johnson v. Adamski*, 274 N.W.2d 267, 268 (S.D.1979) (citing SDCL 15–6–19(b))).

[¶ 37.] We agree with the trial court that the owners of adjacent Tracts B and C are not indispensable to the litigation within the meaning of SDCL 15–6–19(a), as none of the enumerated prerequisites apply. First, complete relief can be granted to Tituses and Chapman on the issue of the correct location of the 1/16th section line as it relates to the boundary of their adjacent lots.

[¶ 38.] Second, neither of the owners of Tract B and Tract C have claimed an interest in the boundary dispute between Tituses and Chapman. The resolution of the boundary dispute between Tituses and Chapman does not impede the ability of these landowners with western boundaries adjacent to Tituses from bringing suit in

the future. The trial court's order locating the 1/16th section line as originally surveyed by the U.S. Forest Service is limited to the common boundary between Tituses and Chapman. The order does not address the boundary between Tituses' lot and Tract B and C.

[¶ 39.] There is no danger that either Tituses or Chapman, parties to the present litigation, would be at a substantial risk of incurring multiple or inconsistent obligations by reason of their claimed interests. Chapman's property is only adjacent to Tituses' property on its western boundary and neither Tracts B nor C share the 1/16th section line in common with Chapman. While Tracts B and C do share the 1/16th line in common with Tituses, again, the trial court's order addressed only the issue of the boundary between Tituses and Chapman.

[¶ 40.] We find the trial court did not abuse its discretion when it did not join the owners of Tracts B and C, as neither owner was an indispensable party to the litigation. We find no abuse of that discretion by the trial court. Affirmed.

[¶ 41.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.