#27074-aff in pt, rev in pt & rem-JMK

**2015 S.D. 80**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CASPER LODGING, LLC,                          Plaintiff and Appellee,

     v.

ROBERT W. AKERS,                              Defendant, Third-Party
                                                  Plaintiff and Appellant,

     v.

ZAKCO COMMERCIAL
CONSULTANTS, INC.,
ABEL DELGADO, DONALD E. DELZER,
DUSTY GRAY, KYLE HAGEN,
PAUL LANDE, JR., JAMES C. HOYT,
KEN PREISLER, SANDRA PREISLER,
JOA SASSER, DEAN SHOELL,
ANGIE SHOELL, BINSWANGER
ENTERPRISES, LLC, MCCALL
POOLS, INC., MOORE
INSULATION, INC. and SHEET
METAL SPECIALTIES, INC.,                      Third-Party Defendants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE WALLY EKLUND
Judge

\* \* \* \*

ARGUED ON MARCH 24, 2015

OPINION FILED **10/28/15**

GREGORY J. ERLANDSON
SARAH E. BARON HOUY
TERRY L. HOFER of
Bangs, McCullen, Butler,
  Foye & Simmons, LLP
Rapid City, South Dakota

Attorneys for plaintiff
and appellee.


MITCHELL PETERSON
ANTHONY M. HOHN of
Davenport, Evans, Hurwitz
  & Smith, LLP
Sioux Falls, South Dakota

Attorneys for defendant, third-party plaintiff and appellant.

#27074

KERN, Justice

[¶1.] In this breach of contract case, the jury found in favor of Casper Lodging, LLC, concluding that Robert Akers failed to deliver to James Koehler a Holiday Inn Express in compliance with the parties' agreements. The jury awarded Casper Lodging $1,019,468.74. Prior to the verdict, the parties had stipulated that the circuit court would determine the date on which prejudgment interest would begin to accrue if there was a plaintiff's verdict. Upon receipt of the verdict, the court declared that prejudgment interest accrued, as a matter of law, from the date of the delivery of the completed Hotel and awarded plaintiff $997,682.83 in prejudgment interest. The court further awarded plaintiff post-judgment interest on the combined sum of the jury verdict and the prejudgment interest calculation. In multiple post-trial motions, Akers asserted that the circuit court made erroneous evidentiary rulings and failed to correctly instruct the jury. Akers claimed that the errors warranted reversal of the jury's verdict and a new trial. The court denied Akers's motions and Akers appeals. We reverse the circuit court's calculation of prejudgment interest and remand for the court to make a factual determination as to the date the loss on which prejudgment interest shall begin to accrue. We affirm on all remaining issues.

## BACKGROUND

[¶2.] On October 15, 2003, Robert Akers agreed to sell to James Koehler a "turn key Eighty-Four (84) unit Holiday Inn Express" in Casper, Wyoming. The purchase price was set at $4,850,400. The hotel was not yet built; therefore, the parties executed a contract entitled "Improvement Purchase Agreement"

(Agreement).  The Agreement "set forth the terms and conditions under which [Akers] agree[d] to sell to [Koehler] the improvements [Akers] is constructing[.]"  In particular, Akers was to build the improvements "pursuant to the plans and specifications prepared by Associated Architects, Ltd. . . . and the improvements" were to be "constructed by Zakco Commercial Consultants, Inc.," the general contractor.

[¶3.]        The Agreement contained eight conditions precedent, "any of which may be waived by the buyer at any time[.]"  One condition provided that Akers "must complete the construction of the improvements in a manner acceptable to [Koehler] in [Koehler's] reasonably exercised judgment."  Another condition required Akers to "complete the construction of the improvements in compliance with all city, county, state, and federal government requirements; government approvals, if any, shall be provided to [Koehler] prior to closing."  Koehler was required, "[o]n a date prior to closing," to obtain "the approval from the Holiday Inn Express system that the Hotel complies with all systems requirements and can be opened for business."

[¶4.]        The Agreement identified that Akers and Koehler "have been negotiating this agreement for at least six months."  The estimated completion date was set at the "end of 2003 of [sic] the beginning of 2004."  Koehler had a right to monitor the construction of the Hotel, but could "not make changes to any of [Akers's] contracts unless the terms and conditions of this agreement [were] complied with."  Akers represented to Koehler that "he will transfer all warranties that are transferable by [him] to [Koehler] at closing[.]"

[¶5.]     On January 16, 2004, Akers and Koehler executed an Addendum to the Agreement. The Addendum accelerated the purchase date to facilitate Koehler's involvement in a 1031 tax-free exchange, with which Akers had previously agreed to cooperate. The Addendum acknowledged that construction of the Hotel "will not be completed in January, 2004, and it is not known when the [Hotel] will be completed," and Koehler "must close the transaction, before the completion of the Improvements[.]" The parties incorporated the Addendum into the Agreement and provided that Akers "shall have a continuing obligation to construct and finish the Improvements in accordance with all governmental requirements and the standards and specifications of the Holiday Inn Express system."

[¶6.]     On February 5, 2004, Akers and Koehler closed on the sale and, on March 11, 2004, Koehler opened the Hotel. Koehler assigned his rights under the agreements to Casper Lodging, LLC, and Casper Lodging entered into a management agreement with The Koehler Organization (TKO) to staff, operate, and maintain the Hotel. Almost immediately after opening the Hotel, guests began complaining about the noise level from accompanying rooms, and Casper noticed issues with sound proofing. Koehler claimed that he informed Akers of the sound issue, to no avail. Ultimately, TKO hired Ernie Cuthbertson to facilitate the repair of the sound issue, which involved taking off sheetrock throughout the rooms and ceilings and installing soundboard. Casper also claimed that within the first six months it began to notice problems with water penetrating the Hotel's exterior. Casper addressed the problems in-house by replacing moist sheetrock, repainting walls, and applying caulk to some windows.

[¶7.]        Although the sound issue was remedied, Casper claimed that problems persisted with the poolroom and with water penetration in the guest rooms.  In 2007, TKO hired John Farr of Wiss, Janney, Elstner Associates, Inc. to inspect the poolroom and issue a report.  Farr issued his report in late 2007.  No formal steps were taken by Casper as a result of Farr's report, although Koehler testified that he was in constant contact with Akers about the problems.  Casper continued to address the problems in-house by using its maintenance staff to make repairs.  Casper also hired certain outside professionals to assist.

[¶8.]        In 2009, Koehler contacted Wendell Potratz of Pro Group to renovate the Hotel's lighting and color in order to make the Hotel match the current Holiday Inn Express aesthetics.  Casper also directed Potratz to address the moisture issues in the poolroom.  Potratz was aware that Farr issued a report in 2007 concerning the poolroom.  Potratz enlisted the help of Farr to assess the current state of the poolroom.  Potratz's original contract covered renovating the Hotel and repairing the issues in the poolroom.  However, Potratz amended that contract after the project started because he and his team noticed additional concerns throughout the Hotel.  Ultimately, Potratz's contract price for the upgrade and repairs was $1,133,913.30, of which he related $802,383 to problems with the building's original construction.  The repairs, renovations, and upgrades were accomplished between 2009 and 2010.

[¶9.]        In October 2009, Casper brought suit against Akers for breach of contract.  Casper alleged that Akers failed to provide an 84-unit turn-key Holiday Inn Express that met all city, county, state, and federal government requirements.

Casper further claimed that Akers failed to build the Hotel in compliance with the controlling plans and specifications. Akers answered the complaint and asserted the affirmative defenses of failure to mitigate damages and waiver. After extensive discovery between the parties, Akers moved the circuit court to amend his answer to assert a third-party complaint against multiple subcontractors. The circuit court granted the motion over Casper's objection, and Akers named fifteen additional parties. The parties stipulated to a trial date of August 2012, which was continued to February 2013, and continued again to December 2013, constituting a delay of sixteen months.

[¶10.]     On July 23, 2013, five months prior to trial, Akers again moved the circuit court to amend his third-party complaint to add a claim against TKO and asked that TKO be joined as an indispensable party under SDCL 15-6-19(a). The court denied Akers's motions. Ultimately, Akers settled his claims against certain third-party contractors and his claim against the general contractor was bifurcated.

[¶11.]     A ten-day jury trial on Casper's claim against Akers was held in December 2013. Koehler and Akers testified about the Agreement and Addendum. Koehler described the extensive construction defects in the building and what actions he took to remedy the problems. Koehler also testified about his efforts to exercise any alleged warranty rights. James Hopkins, the maintenance person employed by the Hotel, testified about the actions he and Casper took to address the poolroom problems. Tom Pogroszewski, the Hotel supervisor, reiterated the measures Hopkins and Casper took to remedy the problems with the Hotel. Doug Vogt, the general manager for TKO, testified that TKO hired Ernie Cuthbertson to

repair the sound issues, at a cost between $200,000 and $250,000.  Vogt also testified that, although Farr was hired in 2007 to evaluate the poolroom problems, TKO and Casper did not act on that report.

[¶12.]     Both parties presented expert testimony about the condition of the Hotel on the date Koehler took possession, identifying the problems that occurred and the cause of the defects.  Dave Stafford, an architect and expert for Casper, testified about the plans and specifications governing the construction of the Hotel under the parties' Agreement and Addendum.  He opined that the plans and specifications did not properly provide that the wall and floor assembly must meet a certain soundness level.

[¶13.]     Ryan Pace was in charge of the day-to-day repairs and renovations undertaken by Potratz, which took nearly a year to complete.  He testified in detail about the problems he observed, the reasons for them, and the steps taken to rectify the damage.  Pace explained that in order to make the repairs, it was necessary to remove the exterior stucco on portions of the building and strip it down to the oriented standard boards (OSB).  The OSB are a veneered waferboard similar to sheets of plywood.  He described problems including: the insulation and studs were damaged in the poolroom due to moisture, 90% of the walls did not have the required vapor barrier to prevent moisture from the outside getting to the inside, some of the anchor bolts were deficient, all of the air conditioning units were installed without caulk or seal, and the studs had a lot of "mis-nails."  Pace testified that in order to properly secure the structure it took two laborers three full days and 25,000 additional nails to re-nail the exterior of the building.  He further

indicated that the doors and windows were installed without the necessary flashing or weatherproofing barriers, which caused water penetration problems throughout the Hotel. He testified that to renovate the poolroom, they had to replace certain windows, repair the ceiling, and increase the air handler in the poolroom to reduce condensation. Additionally, he testified that portions of the roof were too short and the entire roof needed a new drip edge and ice and water shield.

[¶14.] Trent Nelson, a structural engineer hired by Potratz to conduct a site inspection of the building, opined that the building did not comply with the 1997 Uniform Building Code. Specifically, he testified that the structure of the building was lost and was not to code because the studs rotted in response to moisture. He further opined (over Akers's objection) that the building was structurally unsafe at the time of construction. Nelson based this opinion in part on Pace's previous testimony that 25,000 additional nails had to be used to ensure a proper nailing pattern. Nelson also explained that the poolroom should have contained shear walls made up of "studs, properly attached sheathing, and anchors[,]" and that all three must be properly installed to make the structure sound. He testified that the OSB were not properly fastened to the wall by mechanical anchors or hold-downs. Because the OSB were not properly fastened, Nelson opined that the "portion of the intended shear wall in that pool structure" was rendered "useless" and unsafe. He also observed that the exterior grade in front of the building at ground level was about a foot higher than the floor inside. He attributed this to the fact that "there may have been some cultured stone or stucco on the outside" and "typical wood stud framing, non-treated lumber, OSB sheathing" on the inside. According to Nelson,

"code requires that any untreated wood needs to be a minimum of 6 inches above the exterior finish grade." Because "non-treated wood noncompliant with the code had been placed below grade basically along" the front portion of the Hotel, Nelson opined that "over time [it] would likely deteriorate."

[¶15.] Akers moved for a mistrial after the cross-examination of Nelson, asserting that Nelson testified to a previously undisclosed expert opinion and that Nelson's testimony prejudiced Akers. On cross-examination, Nelson admitted that his opinion that the building was unsound from day one was made for the first time at trial and was formed in response to Pace's trial testimony that the nailing pattern was inadequate. The court, disturbed by the new opinion, took a short break to consider the motion for a mistrial. Akers then requested that the court strike Nelson's testimony and admonish the jury. The court granted Akers's request and admonished the jury immediately after the break. The court had also directed Akers that it would admonish the jury again at the end of trial. (At the end of trial, Akers did not request the second admonishment and none was given.)

[¶16.] Loren Schoeneman testified next. Potratz had hired Schoeneman to address the dehumidification issues in the poolroom. Schoeneman, a mechanical engineer, testified that the dehumidification system was deficient and any improper or inadequate maintenance measures taken by Casper were immaterial. He then explained the reasons for his opinion and what actions were needed to rectify the problem.

[¶17.] Potratz, as the person hired to oversee the renovations and repairs, testified about the scope of the repairs undertaken. He explained that he assessed

the needed repairs against code requirements and concluded that the Hotel was not delivered to Koehler in accordance with the required plans and specifications. He also testified to each expense incurred in relation to the type of repair necessary and used as a reference Casper's damages summary prepared pursuant to now-renumbered SDCL 19-19-1006 (Rule 1006).[1] He opined that $1,019,468.74 was a reasonable and necessary amount to fix the Hotel's problems.

[¶18.]	In response to Potratz's opinion regarding damages, Akers sought to admit the rebuttal opinion of its expert Merl Potter. Potter is a construction manager and had given two depositions in preparation for the case. Prior to Potter's testimony at trial, Casper moved in limine to prevent Potter from testifying specifically in regard to Casper's Rule 1006 damages summary. Casper argued that Potter did not, in either deposition, express an opinion related to Casper's specific damages and, therefore, any opinion by Potter on Casper's damages would be new and previously undisclosed. Akers responded that he had previously identified Potter as an expert on damages. He further claimed that Potter's testimony was not a new opinion, but instead, was to be given in rebuttal to the testimony of Potratz. Akers further claimed that Casper only recently issued its Rule 1006 damages summary. The court indicated it would reserve its ruling; however, during Potter's testimony the court prevented Potter from testifying specifically to Casper's claimed damages. Akers made an offer of proof following Potter's testimony.

---

1.	The Code Commission, at the direction of the Supreme Court, renumbered the sections in SDCL chapters 19-9 to 19-13, inclusive, and 19-14 to 19-18. Although SDCL 19-18-6 (Rule 1006) has been renumbered to SDCL 19-19-1006, the previous code section is cited in this opinion.

[¶19.]     Despite being precluded from testifying in specific reference to the damages Casper incurred, Potter did testify about the unsatisfactory efforts Casper undertook to remedy the deficiencies in the building and thereby mitigate its damages.  In particular, Potter explained that Casper's failure to take immediate action to repair known issues exacerbated the damage to the Hotel.  Potter further testified that even though there were problems with the dehumidification system from day one and the PTAC (packaged terminal air conditioner) units were sloped incorrectly and improperly sealed, Casper failed to timely identify and remedy these issues.  In regard to the sound issue, Potter asserted that it was unreasonable for Casper to engage in the repair work before addressing other issues that could have contributed to the problem.  Potter admitted that the windows were likely installed incorrectly, but claimed that the problems should have been noticed before the stucco went on and addressed in a different manner.  He further testified that it was unreasonable to repair the water damage by cutting out wet drywall, air drying it, replacing it, and painting it.  Finally, in Potter's expert opinion, Casper sat on its warranty rights when it failed to conduct the one-year warranty walk through and when it failed to exercise and enforce its warranty rights as problems arose.

[¶20.]     At the close of the case, Akers moved for a directed verdict—now called a judgment as a matter of law.  Akers argued that Casper failed to meet its burden of proof on damages because Casper did not present evidence on both the cost of repair and the diminution in value measures of damages.  Akers further claimed that he did not breach the parties' contract as a matter of law because Casper failed to identify any provision in the Agreement or Addendum that Akers breached.

Further, Akers argued that because Casper failed to pursue certain warranty rights, Casper waived its right to seek relief. Finally, Akers asserted that Casper failed to mitigate its damages as a matter of law when it waited until 2009 to address the issues with the Hotel. The court denied Akers's motion for a judgement as a matter of law.

[¶21.] During the settling of jury instructions, Akers objected to the court's instruction on damages. Instruction 47 provided:

> If you decide for Casper Lodging on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate Casper Lodging for any elements of loss suffered, proved by the evidence to have been legally caused by Akers' conduct, taking into consideration the nature, extent, and duration of the damages, whether such loss could have been anticipated or not, namely:
>
> The reasonable expense of necessary repairs to the damaged property.
>
> Whether any elements of damages have been proved by the evidence is for you to determine. Your verdict must be based on evidence and not upon speculation, guesswork, or conjecture.

Akers claimed that the proper measure of damages was the lesser of the diminution in value and the cost of repairs. The court overruled the objection because, in its view, diminution in value would only come into play when there is an issue whether the building cannot be repaired and, here, it clearly could. The court further refused Akers's requested instruction 45, which would have provided that the measure of damages was the lesser of the diminution in value of the property and the reasonable expense of repair.

[¶22.] Akers also objected to the court's proposed Instruction 50 defining Casper's duty to mitigate its damages, which provided in part: "If you find that

-11-

Casper Lodging took reasonable steps in an effort to mitigate its damages, then you must find that Casper Lodging properly mitigated its damages." Akers argued that the court's proposed instruction would allow the jury to conclude that, so long as Casper took *any* step that was reasonable, it mitigated its damages. The court overruled the objection and included Instruction 50. Akers also requested an instruction telling the jury that under Wyoming law Koehler had certain warranty rights against the contractors who worked on the Hotel.[2] Akers's requested warranty instruction further provided that Akers did not give Koehler any warranties related to the work on the Hotel. The court refused the instruction.

[¶23.] The jury returned a verdict in favor of Casper, awarding Casper the full amount requested: $1,019,468.74. In a post-trial hearing to address the parties' stipulation that the court determine the date upon which Casper's prejudgment interest accrued, Casper argued that interest should accrue from the date Koehler received the defective Hotel—March 11, 2004. Akers, however, submitted that it

---

2. Akers's requested instruction provided:

> As a purchaser of property, Plaintiff was given implied warranties from the contractors who performed work on the Casper, Wyoming, Holiday Inn Express. Those warranties provided that the contractors' work would be performed in a skillful, careful, diligent, and workmanlike manner. Plaintiff had the ability to assert warranty claims and enforce their warranty rights against the contractors involved in the project with regard to any allegedly defective work performed on the project.

> As a non-builder seller of the hotel, Defendant Robert W. Akers did not provide any warranties, express or implied, to Plaintiff or James Koehler with regard to the work performed at the hotel.

should accrue from the time Casper incurred damages—2009 or 2010. The court ruled that under *Gettysburg School District v. Helms & Associates*, it was required to award prejudgment interest from the date Casper received the defective Hotel, March 11, 2004, because that was the date of the breach of contract. *See* 2008 S.D. 35, 751 N.W.2d 266. The court awarded Casper $997,682.83 in prejudgment interest. The court also awarded post-judgment interest set to accrue on the combined jury award and prejudgment interest calculation.

[¶24.]        Akers moved for a mistrial and new trial, asserting that the court improperly admitted Nelson's expert opinion on the nailing pattern, erred when it excluded Potter's rebuttal expert testimony and erred when it allowed counsel for Casper to make improper and highly prejudicial comments during closing argument. In closing argument, counsel for Casper stated, "Mr. Akers has his own remedies against Sheet Metal Specialties." Akers claimed this was in direct violation of the court's order in limine precluding either party from referring to third-party liability. Further, during Casper's rebuttal closing, counsel remarked that if Akers wanted the pictures, "all they had to do was ask." This was in response to Akers's counsel's closing argument that Casper was hiding or concealing evidence of photos taken by Pace. The court denied Akers's motion for a mistrial.

[¶25.]        Thereafter, Akers moved for a judgment as a matter of law and, in the alternative, a new trial. Akers restated the same issues he asserted in his motion for a mistrial and alleged four additional errors. Akers submitted that (1) Casper failed to meet its burden of proof on damages because Casper did not present evidence on the diminution in value measure of damages, (2) the court improperly

instructed the jury on mitigation of damages, (3) Casper failed to identify any provision of the Agreement or Addendum that Akers breached, and (4) Casper failed to exercise its warranty rights as a matter of law. The court denied the motion.

[¶26.]     Akers appeals, and we restate the issues as follows:

> 1. The circuit court committed reversible error when it denied Akers's motion for a judgment as a matter of law due to Casper's failure (a) to present evidence identifying what specific terms of the Agreement or Addendum Akers breached, (b) to present evidence of the diminution in value measure of damages, and (c) to mitigate damages and exercise its warranty rights.
>
> 2. The circuit court committed reversible error when it denied Akers's motion for a mistrial and later motion for a new trial based on (a) the court admitting Nelson's previously undisclosed expert opinion, (b) the court excluding Potter's rebuttal expert testimony on damages, and (c) Casper's counsel's inflammatory and prejudicial closing remarks.
>
> 3. The circuit court abused its discretion when it refused to instruct the jury on Casper's warranty rights, when it refused to instruct the jury that the appropriate measure of damages was the lessor of the diminution in value and cost of repair, and when it improperly instructed the jury on the issue of mitigation of damages.
>
> 4. The circuit court committed reversible error when it awarded Casper prejudgment interest from March 11, 2004, and when it allowed post-judgment interest to accrue on prejudgment interest.
>
> 5. The circuit court committed reversible error when it struck Akers's third-party complaint against TKO and when it did not compel joinder of TKO as an indispensable party defendant.

## ANALYSIS

### 1. Judgment as a Matter of Law

[¶27.]     Under SDCL 15-6-50(a), a court may grant a judgment as matter of law against a party "[i]f during a trial by jury a party has been fully heard on an

-14-

issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]"

### a. Evidence of a Breach of the Agreement or Addendum

[¶28.]     Akers claims that he was entitled to a judgment as a matter of law on Casper's breach of contract claim because neither the Agreement nor the Addendum promised a certain quality of construction.  He further contends that Koehler waived the "Conditions Precedent" when he accepted the Hotel before construction was complete.  Lastly, Akers contends that Casper's dissatisfaction with the lack of sound proofing does not establish a breach of contract because neither the Agreement nor Addendum contains a sound rating requirement.

[¶29.]     We review the court's decision to deny a judgment as a matter of law for an abuse of discretion.  *Bertelsen v. Allstate Ins. Co.*, 2013 S.D. 44, ¶ 16, 833 N.W.2d 545, 554 (citing *Jacobs v. Dakota, Minn. & E. R.R. Corp.*, 2011 S.D. 68, ¶ 9, 806 N.W.2d 209, 212).  We do not weigh the evidence.  *Id.*  "We 'view the evidence and testimony in a light most favorable to the verdict'" and determine if the evidence did support the verdict or if it would have supported it.  *Id.* (citation omitted).  "If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate."  *Id.* (quoting *Roth v. Farner-Bocken Co.*, 2003 S.D. 80, ¶ 8, 667 N.W.2d 651, 659).

[¶30.]     From our review of the record, there is sufficient evidence to support the jury's verdict that Akers breached the parties' contract.  The parties agreed as a term of the initial contract that Akers would sell to Koehler a turn-key Hotel "built pursuant to the plans and specifications prepared by Associated Architects[.]"  This

was not one of the enumerated conditions precedent. The Agreement also provided, as a condition precedent, that Akers was to "complete the construction of the improvements in compliance with all city, county, state, and federal government requirements[.]" The Addendum further required that Akers "shall have a continuing obligation to construct and finish the Improvements in accordance with all governmental requirements and the standards and specifications of the Holiday Inn Express system."

[¶31.] At trial, the jury heard evidence that Akers constructed the Hotel in violation of applicable code provisions because of improperly installed windows and air conditioning units, inadequate wind-load requirements, and the absence of necessary vapor barriers on many wall assemblies. The jury also heard testimony that, contrary to the plans and specifications, the poolroom dehumidification system was defective, windows were installed in violation of manufacturer instructions, portions of the Hotel roof lacked proper edging and necessary underlayment or tar paper and were too short, the stucco system was not properly constructed, and the windows and PTAC units were not properly flashed. On the sound rating issue, Casper presented evidence that the Hotel standards required a certain sound rating and that Akers did not construct the walls to this rating.

[¶32.] Because there is a legally sufficient evidentiary basis for the jury to find for Casper on the issue of breach, the circuit court did not abuse its discretion when it denied Akers a judgment as a matter of law on this issue.

### b. Diminution in Value Measure of Damages

[¶33.]     Akers first contends that the court abused its discretion when it did not enter a judgment as a matter of law against Casper on Casper's failure to present evidence of competing measures of damages.  According to Akers, the proper measure of damages is the *lesser* of (1) the difference between the reasonable value of the Hotel with and without the construction defects and (2) the reasonable cost to repair the Hotel.  Akers further argues that Casper bore the burden of presenting evidence of both measures of damage to the jury.  Akers submits that to hold otherwise would allow Casper to recover more than it would have gained had Akers not breached the Agreement or Addendum.

[¶34.]     Casper, on the other hand, relies on SDCL 21-2-1, which sets forth that the general measure of damages in a contract dispute "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Casper argues it was not required to present evidence on the diminution in value because it presented evidence to support the amount that was necessary to compensate it for the damage proximately caused by the breach, namely the cost of making the repairs.  Moreover, Casper contends that Akers had the burden to present evidence that Casper's method of proving damages was unreasonable or unwarranted.

[¶35.]     We have said that the purpose of contract damages is to put the injured party in the same position it would have been in had there not been a breach.  *Lamar Adver. of S.D., Inc. v. Heavy Constructors, Inc.*, 2008 S.D. 10, ¶ 14,

745 N.W.2d 371, 376; *see also* SDCL 21-1-5 (cannot recover more than what the party could have gained by full performance by both sides). However, "[n]o damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin." SDCL 21-2-1. Moreover, "[d]amages must in all cases be reasonable[.]" SDCL 21-1-3.

[¶36.] Akers relies upon our holding in *Rupert v. City of Rapid City*, a recent inverse condemnation case, in which we recognized that a "landowner may generally only recover restoration costs if that amount does not exceed the diminution in value of the property." *See* 2013 S.D. 13, ¶ 27, 827 N.W.2d 55, 66. This is because this Court has "traditionally held that the proper measure of damages *in condemnation cases* involving a partial taking or damaging of property 'is the difference between the fair market value of the unit before the taking and the fair market value of what remains after the taking[.]" *Id.* ¶ 20 (emphasis added) (citing *Corson Vill. Sanitary Dist. v. Strozdas*, 539 N.W.2d 876, 879 (S.D. 1995) (quoting *City of Sioux Falls v. Kelley*, 513 N.W.2d 97, 103 (S.D. 1994))). This case, however, is not a condemnation case and, therefore, *Rupert* is not controlling.

[¶37.] Akers next directs this Court to *Ward v. LaCreek Electric Association, Inc.*, where we held that the proper measure of damages "is the lesser of the following: I. The difference between the reasonable value of the house immediately before and immediately after its injury, or II. The reasonable expense of repair if the house can thereby be substantially restored to its former condition." *See* 83 S.D. 584, 594, 163 N.W.2d 344, 349 (1968). He further relies on *Subsurfco, Inc. v. B-Y Water District*, a breach of contract case in which we reversed because "B-Y

recovered an improper measure of damages contrary to the diminution in value rule and SDCL 21-1-3 and [SDCL] 21-1-5." 337 N.W.2d 448, 455 (S.D. 1983).

[¶38.]    A closer reading of both cases, however, reveals that neither *Ward* nor *Subsurfco, Inc.*, stand for the proposition that in order to recover damages for a breach of contract, the *plaintiff* must present evidence on both the diminution in value and cost of repair measures of damages. In *Ward*, the plaintiff presented evidence to support the diminution in value measure of damages and the *defendant* countered with evidence on the cost of repair measure of damages. 83 S.D. at 591, 163 N.W.2d at 348. We held that "with reference to the house in this case" the proper measure of damages was the lesser of the diminution in value and cost of repair. *Id.* at 594, 163 N.W.2d at 349. Here, however, the jury did not have before it evidence of both measures of damages. Further, Akers does not claim that Casper's damages were not clearly ascertainable in their nature and origin in violation of SDCL 21-1-5.

[¶39.]    In *Subsurfco, Inc.*, the defendant presented evidence that the plaintiff's damage award violated the diminution in value rule. The defendant further claimed that the damage award was unreasonable, unconscionable, and grossly oppressive in violation of SDCL 21-1-5, and that, in violation of SDCL 21-1-3, the plaintiff recovered more than it would have had the contract been fully performed. 337 N.W.2d at 455. We held that the plaintiff recovered an improper measure of damages because the defendant established that "the defects cannot be remedied without reconstruction of a substantial portion of the work[,]" and the plaintiff "recovered damages totalling [sic] 49% of the bid price of the entire contract and

almost a million dollars more than the price bid for the material and installation of the pipe in question." *Id.* Yet, here, Akers does not allege that, by recovering the cost of repair, Casper was placed in a better position than it would have been in had Akers performed under the contract. Akers further has not alleged or presented evidence that the defects caused by Akers's breach could only be remedied by reconstruction of a substantial portion of the Hotel.

[¶40.]      "Frequently, both measures of damages are in evidence and are complimentary to the other," but "[a]n injured party may choose to present his case using either or both methods of measuring damages[.]" *John Thurmond & Assocs., Inc. v. Kennedy*, 668 S.E.2d 666, 668-69 (Ga. 2008). *See Martin v. Design Constr. Servs., Inc.*, 902 N.E.2d 10, 15 (Ohio 2009); *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005); *Legacy Builders, LLC v. Andrews*, 335 P.3d 1063, 1069-70 (Wyo. 2014). Therefore, if an injured party seeks to recover the fair market value of the damaged property, the injured party must present evidence to support a claim for damages under that method. The defendant, then, "has the burden to present any contradictory evidence challenging the reasonableness or proportionality of those damages and where appropriate, evidence of an alternative measure of damages for the jury's consideration." *John Thurmond & Assocs., Inc.*, 668 S.E.2d at 669.

[¶41.]      Because neither *Ward* nor *Subsurfco, Inc.*, are controlling, and Akers, as the party challenging the reasonableness of Casper's damages, had the burden to present evidence to support his claim that Casper's damages were unwarranted,

unreasonable, or excessive, the circuit court did not abuse its discretion when it denied Akers's motion for a judgment as a matter of law on this issue.

### c. Mitigation of Damages and Warranty Rights

[¶42.]     Akers argues that he is entitled to a judgment as a matter of law on his affirmative defenses that Casper failed to mitigate its damages and that Casper waived its right to recover when it failed to exercise its warranty rights under Wyoming law.  In regard to Casper's duty to mitigate its damages, Akers contends that many of the problems with the Hotel were observable in 2004, which problems Casper ignored and failed to repair until 2009–2010.  Akers further claims that Casper, as a subsequent purchaser, had implied warranty rights under Wyoming law.  Because Casper failed to pursue these rights, Akers submits that the "risk of construction defects was allocated to Casper[.]"

[¶43.]     A judgment as a matter of law is not appropriate when sufficient evidence exists such that reasonable minds could differ.  *Bertelsen*, 2013 S.D. 44, ¶ 16, 833 N.W.2d at 554.  With reference to Casper's alleged failure to mitigate its damages, the jury heard testimony from Akers's witnesses related to the actions Casper and its agents failed to take when the water penetration problems were first observed at the Hotel.  The jury then heard contradictory evidence from Casper's witnesses that Casper mitigated its damages because it continued to take action to address the problems as they occurred.  On the warranty issue, Akers presented evidence that he transferred his warranty rights to Koehler and that Casper failed to timely exercise these rights.  Casper, however, presented evidence through Koehler's testimony that it attempted to contact certain subcontractors when

defective work was observed, but that the subcontractors would not respond. Casper also argued to the jury that Akers had no evidence that Akers actually transferred to Casper the necessary warranty information as required in the Agreement.

[¶44.] Because we do not weigh the evidence and because we view the evidence in the record in a light most favorable to the verdict, we cannot say the court abused its discretion when it denied Akers a judgment as a matter of law on this issue. *See Jacobs*, 2011 S.D. 68, ¶ 9, 806 N.W.2d at 212. The jury could have believed that Casper's efforts to mitigate the problems as they arose were sufficient and reasonable under the circumstances. Further, there is evidence in the record that may have led the jury to conclude that Casper did not waive its right to recover when it did not exercise alleged warranty rights.

## 2. Motion for a Mistrial and Motion for a New Trial

[¶45.] "We review denials of mistrial and new trial motions for an abuse of discretion." *Walter v. Fuks*, 2012 S.D. 62, ¶ 22, 820 N.W.2d 761, 767. "[A] new trial may follow only where the violation has prejudiced the party or denied him a fair trial. Prejudicial error is error which in all probability produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 426 (S.D. 1994).

## a. Previously Undisclosed Expert Opinion

[¶46.] Prior to Trent Nelson's testimony and outside the presence of the jury, counsel for Akers asked the circuit court to prevent Nelson from testifying that the inadequate nailing pattern made the structure unsound and unsafe from day one.

Akers submitted that the opinion was new and previously undisclosed and substantially prejudiced his defense. In response, Casper quoted Nelson's deposition testimony and submitted to the court that nailing pattern meant fastening pattern and, therefore, Nelson's opinion was not new. The court allowed the testimony, remarking that "a nail is a fastener" and, therefore, Nelson did give a previous opinion about the fastening pattern.

[¶47.] During direct examination, Nelson offered the opinion that from day one the Hotel was unsafe, structurally unsound, and in violation of the applicable code as a result of the inadequate nailing pattern related to the OSB. On cross-examination, Nelson admitted that his opinion was new—he formed it after listening to Pace's previous trial testimony. Counsel for Akers then engaged in a lengthy cross-examination challenging the basis of Nelson's opinions and his qualifications to render an opinion.

[¶48.] Akers now claims that the court abused its discretion when it denied his motions for a mistrial and new trial. According to Akers, Nelson's opinion that the Hotel was unsound and unsafe from day one negated his critical and viable defense that Casper had failed to mitigate its damages. Thus, he submits that, although the court ultimately struck Nelson's opinion and admonished the jury, he was denied a fair trial because the "damage had already been done."

[¶49.] "As a general rule, if a court excludes improperly admitted evidence and directs the jury to disregard it, the error is cured." *Young v. Oury*, 2013 S.D. 7, ¶ 18, 827 N.W.2d 561, 567. "If, however, after probing the record, it appears the prejudicial effect of the admission was not fully overcome, despite the curative

instruction, a new trial is warranted." *Id.* In *Young*, we identified certain considerations relevant to assessing whether the prejudicial effect of an admission was fully overcome. Those are: "(1) to what extent did the evidence go directly to a critical issue, (2) is the evidence inherently prejudicial and of such a character that it would likely impress itself upon the minds of the jurors, (3) was the curative instruction firm, clear, and accomplished without delay, and (4) was there any misconduct on the part of the offering party?" *Id.* ¶ 19.

[¶50.] There is no doubt that Nelson's testimony that the inadequate nailing pattern made the Hotel unsafe and unsound from day one related directly to a critical issue in the case. However, the court's curative instruction was firm, clear, and accomplished without delay.[3] The instruction was crafted by the parties and was given at the first moment possible—after the jury returned from its recess. In regard to misconduct by Casper, there is no evidence that Casper knew Nelson was going to express this opinion until trial. Indeed, Nelson admitted he formed his opinion while listening to another witness's testimony.

[¶51.] Lastly, we consider whether the evidence was "inherently prejudicial and of such a character that it would likely impress itself upon the minds of the

---

3. The admonishment provided:

> 1. Mr. Nelson's opinions that the OSB was improperly fastened or had insufficient nails is stricken by the court.
>
> 2. Mr. Nelson's opinions that the building was structurally unsound at the time Mr. Akers sold the building to the plaintiff based on improper fastening or not having enough nails in the OSB is stricken by the court.
>
> 3. You shall disregard these opinions in their entirety.

jurors." *See id.* In *Young*, we explained that this factor concerns "what the jury actually saw and heard and how much the jurors were expected to disregard." *Id.* ¶ 21. On direct examination, the jury heard Nelson testify that the OSB were improperly nailed during the original construction. The jury also heard Nelson explain that the improper nailing violated certain applicable code provisions and made the building unsafe and unsound from the day it was delivered to Koehler. This testimony spanned approximately five transcript pages. Then, through cross-examination, the jury heard Nelson admit that his opinion was new and was formed only after Nelson heard Pace previously testify. The jury also heard counsel for Akers explore and scrutinize the veracity of Nelson's newly-disclosed opinion.

[¶52.]    Based on our review of the character of the evidence, we cannot say that Nelson's opinion was so inherently prejudicial so as to impress itself on the minds of the jurors. His new opinion, given on direct examination, was short in duration and delivered solely through verbal statements. *Contra Young*, 2013 S.D. 7, ¶ 21, 827 N.W.2d at 567 (witness left the witness stand to use a laser pointer to draw attention to the chart). It is also relevant that Nelson's opinion was not the first time the jury heard that the structure was short 25,000 nails; Pace had already alerted the jury to that fact and that it took two men three days to correct the problem.

[¶53.]    After probing the record, we cannot say that the prejudicial effect of Nelson's testimony was not fully overcome by the curative instruction and by the court's admonition to the jury that the opinion be stricken and disregarded. The court promptly and sufficiently admonished the jury and struck the testimony. The

improper testimony was not relied upon or highlighted through the remainder of the trial. The circuit court did not abuse its discretion when it denied Akers's motions for a mistrial and new trial on this issue.

### b. Exclusion of Potter's Rebuttal Expert Testimony on Damages

[¶54.] Akers next contends that the circuit court improperly excluded Akers's rebuttal expert testimony on damages. Akers sought to have Potter testify in direct response to the damages testimony presented by Casper's expert Potratz. Prior to Potter's testimony, Casper moved in limine to prevent any opinion by Potter on Casper's damages because Potter did not testify in his deposition about Casper's alleged damages and did not update his expert opinion after Akers had in his possession Casper's Rule 1006 damages summary. Akers responded that Potter was unable to testify in response to Casper's damages summary because Casper submitted its damages summary after the deadline for disclosures. Akers further highlighted that even Casper's expert—Potratz—could not testify to Casper's damages summary during his deposition because the summary had just been completed. Because Potratz was allowed to testify about the new damages summary, Akers submitted Potter should similarly be permitted to testify. The court reserved ruling on Casper's motion in limine, but ultimately sustained each objection by Casper related to any testimony from Potter on Casper's damages summary.

[¶55.] On appeal, Akers argues that the circuit court abused its discretion when it denied his motions for a mistrial and new trial based on the exclusion of Potter's rebuttal testimony. In Akers's view, "there was no way Potter could answer

specific questions regarding Casper's damages" during his deposition because Casper did not provide its damages summary until *after* the deposition and *after* the expert disclosures deadline. Akers further contends that he was prejudiced because the jury awarded Casper 100% of its requested damages "[d]espite overwhelming evidence of Casper's failure to mitigate damages, and Casper's admission that prompt action would have reduced damages[.]"

[¶56.] A court has discretion to admit expert testimony and we review the decision to admit or exclude it for an abuse of discretion. *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 15, 764 N.W.2d 474, 481. It is well established that "parties are 'under a duty seasonably to supplement [their] response[s] with respect to any question directly addressed to . . . the subject matter on which [the expert witness] is expected to testify, and the substance of [the expert's] testimony.'" *Id.* (alterations in original); SDCL 15-6-26(e).

[¶57.] Here, the record supports the court's decision to exclude Potter's rebuttal testimony on Casper's Rule 1006 damages summary. Potter was deposed two days before Casper submitted to Akers its Rule 1006 damages summary. However, when Potter was deposed, Akers had received from Casper all documents that ultimately formed the basis of Casper's Rule 1006 damages summary. More importantly, after Akers received Casper's damages summary, Akers did not fulfill its duty to supplement Potter's intended expert opinion as required by SDCL 15-6-26(e). It was insufficient to simply identify that Potter was an expert witness on the issue of damages.

[¶58.] We also note that, unlike Potter, Potratz gave a detailed opinion during his deposition on the damages claimed by Casper. Potratz offered his expert testimony on damages despite the fact that he (like Potter) did not have an opportunity to specifically examine Casper's Rule 1006 damages summary. Furthermore, Potter made it clear in his deposition that he was not expressing an opinion on the damages claimed by Casper. Finally, the exclusion of Potter's rebuttal testimony did not prevent Akers from presenting evidence contradicting Casper's claimed damages or in support of his defense that Casper failed to mitigate its damages. The court did not abuse its discretion when it denied Akers's motions for a mistrial and new trial on this issue.

### c. Closing Remarks by Casper's Counsel

[¶59.] Prior to trial, the court issued an order instructing counsel to approach the bench before discussing Akers's third-party claims in open court. During Casper's closing argument, and without first approaching the bench, counsel stated, "Akers has his own remedies against Sheet Metal and Zakco." Sheet Metal is a subcontractor and Zakco is the general contractor. Akers now claims that this statement "was equivalent to telling the jury that Akers had insurance in the form of remedies against contractors," which statement he submits prejudiced him. Akers further contends that during Casper's rebuttal closing argument, counsel "undercut a central defense theory by blaming Akers for Casper's nondisclosure" of 700 renovation photographs. In light of Casper's remarks in closing argument, Akers insists the court abused its discretion when it did not order a mistrial or grant a new trial.

[¶60.]    In reviewing the court's decision to deny a new trial, we "interfere only when[,] from an examination of the entire record, [we are] convinced that there has been a miscarriage of justice." *Schoon v. Looby*, 2003 S.D. 123, ¶ 18, 670 N.W.2d 885, 891 (quoting *Roth*, 2003 S.D. 80, ¶ 37, 667 N.W.2d at 664). This is because "a plaintiff should not be penalized for the misstatements of his counsel and the granting of a new trial should not be used to discipline counsel." *Id.* Therefore, "a new trial may follow only where the violation has prejudiced the party or denied him a fair trial. Prejudicial error is error which in all probability produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Harter v. Plains Ins. Co., Inc.*, 1998 S.D. 59, ¶ 32, 579 N.W.2d 625, 633 (quoting *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 426 (S.D. 1994)).

[¶61.]    From an examination of the entire record, counsel's remarks in closing argument did not in all probability produce some effect on the jury's verdict. Although Casper did not approach the bench before referring to Akers's third-party claims, counsel's statement was isolated and not inflammatory. Also, the statement was not the equivalent of putting evidence in the record that a person has liability insurance. *See Atkins v. Stratmeyer*, 1999 S.D. 131, ¶ 13, 600 N.W.2d 891, 896 (plaintiff referred to health insurance, not liability insurance). In regard to Casper's statement suggesting that Akers could have obtained the 700 pictures, Akers did not object to this statement. The failure to object deprived the circuit court of the opportunity to rule on the issue and admonish the jury, and Akers's failure to object waived the right to argue the issue on appeal. *See Veith v. O'Brien*, 2007 S.D. 88, ¶ 67, 739 N.W.2d 15, 34. Because there is no prejudice from counsel's

remarks during closing argument, the circuit court did not abuse its discretion when it denied Akers's motions for a mistrial and new trial on this issue.

### 3. Jury Instructions

[¶62.] It is well-settled that "[a] trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *Wangsness v. Builders Cashway, Inc.*, 2010 S.D. 14, ¶ 10, 779 N.W.2d 136, 140 (quoting *State v. Cottier*, 2008 S.D. 79, ¶ 7, 755 N.W.2d 120, 125). We have said that a circuit "court should instruct the jury on issues supported by competent evidence in the record"; however, the court "is not required to instruct on issues that do not find support in the record." *Bauman v. Auch*, 539 N.W.2d 320, 323 (S.D. 1995). Moreover, it is not error to refuse to give an instruction that does not correctly set forth the law. *Id.*

### a. Instruction on Warranty Rights

[¶63.] Akers requested an instruction describing the warranty rights Casper had available under Wyoming law. The requested instruction provided that Casper "had the ability to assert warranty claims and enforce [its] warranty rights against the contractors involved in the project" based on Wyoming law, and that Akers "did not provide any warranties, express or implied, to [Casper] or James Koehler with regard to the work performed at the hotel." Akers asserts that this instruction supported his claim that Casper waived its right to seek relief because it failed to exercise its warranty rights. The court refused Akers's requested instruction. On appeal, Akers submits that the instruction was a proper statement of the law and

that, by refusing the instruction, Akers was prevented from adequately arguing to the jury that Casper's failure to exercise its warranty rights constituted a failure to mitigate its damages.

[¶64.]     From our review of the record, the court properly refused Akers's requested instruction.  The requested instruction was not supported by competent evidence in the record and would have improperly told the jury that, as a matter of law, Casper had certain warranty rights.  Any warranty rights that Casper may have had (and waived) were disputed in the case.  Moreover, the court adequately instructed the jury on the issue of waiver:

> A waiver occurs when one in possession of a right, whether obtained by law or by agreement, who with full knowledge of the facts, voluntarily and intentionally does or fails to do something inconsistent with the enforcement of that right.
>
> To support a defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to give up the existing right.  There can be no waiver unless so intended by one party and so understood by the other.  A person who has waived a right cannot recover based on that right.
>
> The burden of proof to establish waiver is on the party who seeks to rely on it.

Instruction 42.  Therefore, the court did not abuse its discretion when it refused Akers's requested warranty and waiver instruction.

### b. Instruction on the Measure of Damages

[¶65.]     Akers next claims that the court abused its discretion when it failed to instruct the jury that the appropriate measure of damages was the lesser of the diminution in value or the cost of repair.  Because Akers did not present any

evidence on the diminution in value measure of damages, the circuit court properly refused Akers's requested instruction. *See supra* ¶¶ 38-41.

### c. Instruction on Mitigation

[¶66.] Akers contends the court's instructions on mitigation of damages were incorrect and misled the jury, which error necessitates a new trial. The court provided two instructions on mitigation:

Instruction 49

> In determining the amount of money which will reasonably compensate the plaintiff, you are instructed that a person whose property is damaged must exercise reasonable diligence and effort to minimize existing damages and to prevent further damages. The law imposes upon a party injured by another's breach of contract the active duty of making reasonable exertion to render the injury as light as possible. If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, which was avoidable by the performance of his duty, falls on him. Plaintiff cannot recover money for damage to property which could have been avoided by the exercise of reasonable diligence and effort.

Instruction 50

> Akers has the burden of proving that Casper Lodging failed to mitigate its damages. Casper Lodging claims that it mitigated its damages. If you find that Casper Lodging took reasonable steps in an effort to mitigate its damages, then you must find that Casper Lodging properly mitigated its damages.

Akers objected to Instruction 50, asserting that it would allow the jury to find against Akers if Casper took *any* reasonable step to mitigate. On appeal, Akers claims he was prejudiced by the court's incorrect and misleading instruction from the fact "the jury awarded Casper every penny of its claim," even though Casper admitted some damages could have been avoided by making repairs earlier.

[¶67.] We recently explained that the duty to mitigate damage caused by a breach of contract is an "active duty of making reasonable exertion to render the injury as light as possible." *Arrowhead Ridge I, LLC v. Cold Stone Creamery, Inc.*, 2011 S.D. 38, ¶ 16, 800 N.W.2d 730, 735 (quoting *Ducheneaux v. Miller*, 488 N.W.2d 902, 917 (S.D. 1992)). Thus, if a plaintiff, by his negligence or willfulness, "allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him." *Id.* The burden is on the breaching party to prove that "damages would have been lessened by the exercise of reasonable diligence on the part of the non-breaching party." *Ducheneaux*, 488 N.W.2d at 918 (citing *Hepper v. Triple U Enters., Inc.*, 388 N.W.2d 525, 530 (S.D. 1986); *Renner Elevator Co. v. Schuer*, 267 N.W.2d 204, 207 (S.D. 1978)).

[¶68.] Upon review of our prior cases, it is clear the last sentence of Instruction 50 should not have been given. That sentence reads: "If you find that Casper Lodging took reasonable steps in an effort to mitigate its damages, then you must find that Casper Lodging properly mitigated its damages." Casper's duty to mitigate its damages required that Casper exercise reasonable diligence, not take reasonable steps in an effort. *See Sun Mortg. Corp. v. W. Warner Oils Ltd.*, 1997 S.D. 101, ¶ 26, 567 N.W.2d 632, 637 (defining reasonable diligence); *see also Stadheim v. Becking*, 290 N.W.2d 273, 275 (S.D. 1980).

[¶69.] Nonetheless, we do not view an instruction in isolation. Rather, "we construe jury instructions as a whole to learn if they provided a full and correct statement of the law." *Behrens v. Wedmore*, 2005 S.D. 79, ¶ 37, 698 N.W.2d 555, 570 (quoting *First Premier Bank v. Kolcraft Enters., Inc.*, 2004 S.D. 92, ¶ 40, 686

N.W.2d 430, 448). The court, consistent with our past cases, properly informed the jury that Akers had the burden of proving that Casper failed to mitigate its damages. The court further adequately defined for the jury that the duty to mitigate required Casper to "exercise reasonable diligence and effort to minimize existing damages and to prevent further damages." Because the court's instructions, taken as a whole, provided a correct statement of the law on mitigation of damages, we cannot say that "in all probability it produced some effect upon the verdict" or that it was harmful to Akers's substantial rights. *See id.*

### 4. Prejudgment Interest and Post-Judgment Interest

[¶70.] During the settling of the jury instructions, the parties agreed to allow the circuit court to determine the appropriate date to calculate prejudgment interest in the event the jury found in favor of Casper. At a post-trial hearing to determine prejudgment interest, Akers submitted that, assuming that there was a breach of contract, Casper did not suffer damage until the time Casper undertook substantial repairs, which was 2009 or 2010. During the oral argument before this Court, Casper admitted that it had incurred zero expense on March 11, 2004 (the date of the breach and delivery of the Hotel). However, Casper argued that based upon this Court's decision in *Gettysburg*, the date of loss was March 11, 2004, notwithstanding that Casper had yet to incur an expense as a result of the breach. *See* 2008 S.D. 35, 751 N.W.2d 266.

[¶71.] At the post-trial hearing, the circuit court informed the parties that it believed *Gettysburg* required it to calculate prejudgment interest from March 11, 2004. It remarked, "It's contrary to my thinking that you can collect interest on

something before you expend the money for repair, but that is what the *Gettysburg*

school case tells me." Counsel for Akers argued that *Gettysburg* did not stand for

that proposition and urged the court to make a factual determination on the date

Casper was damaged and suffered a loss. In response the court said,

> As much as I would like to accept your argument on that, I think the *Gettysburg* case tells me to the contrary. But the nice part about it is, it's easily calculated for the Supreme Court to straighten me out if I'm wrong. And, truthfully, I think I may very well be wrong, but I think - - I mean, to me, common sense tells me you you shouldn't collect interest on something that hasn't gone out of your pocket yet. But on the other hand, Jim Koehler did pay for the hotel in full as of the date. So to that extent, he's out that money.

The court awarded prejudgment interest starting on March 11, 2004, which amount

equaled $997,682.83.

[¶72.] In *Gettysburg*, the school district received a defective track in 2002,

and for nearly two years, the contractor attempted to repair the problems with the

track. *Id.* ¶¶ 2-5. In June 2004, after efforts to correct the problems had failed, the

school district hired an outside consultant to examine the track. *Id.* ¶ 6. The

consultant issued a report setting forth the underlying structural defects in the

track's construction and reached the conclusion that the defects would be nearly

impossible to repair. Ultimately, the school district brought suit against the

contractor for breach of contract and prevailed in a jury trial. The jury awarded the

school district damages and prejudgment interest from July 4, 2004. *Id.* ¶ 7.

[¶73.] On appeal the contractor asserted "that damages were too uncertain to

be taxed with prejudgment interest" because the school district had not yet

expended funds to repair the defective track. *Id.* ¶ 23. We noted that prejudgment

interest is calculated "from the day the loss or damage occurred." *Id.* ¶ 24 (quoting SDCL 21-1-13.1). We then declared that "[t]he loss or damage occurred when the District received the faulty track." *Id.* Yet, the school district received the track in 2002, and the jury awarded prejudgment interest to begin on July 4, 2004. From our review of this decision, we cannot ascertain the basis for the jury's selection of this date. Regardless, this Court's statement that "[t]he loss or damage occurred when the District received the faulty track" suggests that prejudgment interest in a breach of contract case *must* be calculated on the date of the breach. We now expressly reject this language, and to the extent *Gettysburg* created such a rule, it is overruled.

[¶74.] Prejudgment interest is mandatory and it is recoverable "from the day that the loss or damage occurred, except during such time as the debtor is prevented by law, or by act of the creditor, from paying the debt." SDCL 21-1-13.1; *see JAS Enters., Inc. v. BBS Enters., Inc.*, 2013 S.D. 54, ¶ 45, 835 N.W.2d 117, 129. The purpose of prejudgment interest "is to do justice to one who has suffered a loss at the hands of another." *S.D. Bldg. Auth. v. Geiger-Berger Assocs., P.C.*, 414 N.W.2d 15, 19 (S.D. 1987). An award of prejudgment interest "seeks to compensate the injured party for this wrongful detention of money owed." *Id.*

[¶75.] Although the purpose of prejudgment interest is well established, our case law is not as clear on what date prejudgment interest should begin to accrue for each measure of damages. We find the Colorado Supreme Court's analysis in *Goodyear Tire & Rubber Co. v. Holmes*, helpful on the proper method to compute prejudgment interest in a breach of contract case. *See* 193 P.3d 821, 828 (Colo.

2008). Although Colorado's prejudgment interest statute is distinguishable, we find the court's analysis instructive. *See id.* at 825.

[¶76.] The court in *Goodyear* explained that in order to seek recovery from a loss, a plaintiff must first quantify the loss by establishing a measure of damages. *Id.* at 826. "During the period between the time at which the plaintiff's loss is measured and the judgment, the plaintiff is deprived of the use of the money or property that would constitute the award." *Id.* "As a result, the plaintiff suffers a loss, frequently termed 'time value of money.'" *Id.* "This lost value is caused by inflation, reducing the value of money over time, and by plaintiff's inability . . . to earn a return on it." *Id.*

[¶77.] In a case where the measure of damages is the diminution in the market value of the property, the "damages focus on the damaged asset and measure the resulting change in the plaintiff's net worth." *Id.* at 827. Accordingly, when a plaintiff seeks damages for diminution in value, his loss is properly measured at the time of the injury to his property. To conclude otherwise would deny the plaintiff the ability "to earn a return on the amount of the damages, and he will also suffer a loss due to inflation between the time the damages are calculated and the time of the judgment." *Id.* at 827-28.

[¶78.] However, when the measure of damages is cost of repair, the focus is on the actual expenditures made by the plaintiff to make the repairs rather than the damaged property itself. This is because "the plaintiff retains the use of the money later used to repair or obtain a replacement and therefore can earn a return on it." *Id.* at 828. Therefore, the loss or damage will not occur until sometime after

the plaintiff is wronged. Indeed, "the plaintiff does not suffer any time value of money loss until the time when she incurs the replacement costs[.]" *Id.*

[¶79.]     Applying these concepts to the facts of this case, we note that Casper sought and the circuit court authorized the cost of repair measure of damages. Therefore, Casper did not suffer any loss of return on its original investment until it incurred costs of repair. Although the circuit court was justified in relying on our holding in *Gettysburg*, upon remand the court is instructed to compute prejudgment interest based on the cost of repairs incurred by Casper from the date the expenses were incurred.

[¶80.]     Akers further contends that the circuit court erred when it ordered that post-judgment interest was to accrue on the court's award of prejudgment interest. Akers submits that the circuit court improperly awarded interest on interest. This Court has not before addressed the precise question whether an award of post-judgment interest can accrue on prejudgment interest. A review of cases from other courts, however, reveals that an award of post-judgment interest on an award of prejudgment interest does not result in an award of interest on interest. *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995) (collecting cases); *see also Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1338 (8th Cir. 1991) (analyzing similar federal rule, 28 U.S.C.A § 1961); *Balder v. Haley*, 441 N.W.2d 539, 544 (Minn. Ct. App. 1989). Post-judgment interest is intended to compensate an injured plaintiff for being deprived of compensation for a loss during the time of the ascertainment of the loss and the recovery. *See* SDCL 54-3-5.1. It is not designed to operate as a penalty. Thus,

prejudgment interest is part of the loss—compensation to the injured party for that party's loss of use of their money caused by the breach of contract. *See Jackson v. Lee's Travelers Lodge, Inc.*, 1997 S.D. 63, ¶ 40, 563 N.W.2d 858, 868. The circuit court did not err when it awarded Casper post-judgment interest on prejudgment interest.

### 5. Claims against TKO by Akers

[¶81.] The Koehler Organization (TKO) is the management company for Koehler's hotels. During his testimony, Koehler explained that he is in essence TKO because TKO is a sole proprietorship. Akers does not dispute that he knew of TKO and its role in the management of the Hotel. Nonetheless, Akers submits that SDCL 15-6-19 does not give the court discretion to join or exclude TKO as a party, and that he had a "right" to assert a third-party claim against TKO under SDCL 15-6-14(a).

[¶82.] A circuit court has no discretion whether to join an indispensable party because SDCL 15-6-19(a) is mandatory. *Titus v. Chapman*, 2004 S.D. 106, ¶ 15, 687 N.W.2d 918, 923. Thus, "[a] party's status as an indispensable party is a conclusion of law." *Id.* Under SDCL 15-6-19(a),

> A person who is subject to service of process shall be joined as a party in the action if:
>
> > (1) In his absence complete relief cannot be accorded among those already parties; or
> >
> > (2) He claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a

> party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

"[W]hether or not a person is an indispensable party is [a decision] which must be made on a case-by-case basis and is dependent upon the facts and circumstances of each case." *Titus*, 2004 S.D. 106, ¶ 36, 687 N.W.2d at 927 (citing *Provident Tradesmens Bank Tr. Co. v. Patterson*, 390 U.S. 102, 119, 88 S. Ct. 733, 743, 19 L. Ed. 2d 936 (1968)). However, simply because a person might have an interest in the outcome of litigation does not make the person an indispensable party. *Id.*

[¶83.] TKO is not an indispensable party. TKO does not "have a direct interest in the litigation[,]" and TKO's interest is not "such that it cannot be separated from that of the parties to the suit[.]" *See Smith v. Albrecht*, 361 N.W.2d 626, 627-28 (S.D. 1985). TKO is not necessary to determine whether Akers breached the contract when Akers delivered the Hotel to Koehler. Nor is TKO's presence necessary for the jury to determine Akers's defenses of waiver and failure to mitigate damages. TKO is a potential joint tortfeasor, but that status does not make it an indispensable party. *See Temple v. Synthes Corp.*, 498 U.S. 5, 7, 111 S. Ct. 315, 316, 112 L. Ed. 2d 263 (1990); *see also Whiting v. Hoffine*, 294 N.W.2d 921 (S.D. 1980). Because TKO is not an indispensable party, the court did not err in denying Akers's motion to join TKO under SDCL 15-6-19(a).

[¶84.] Lastly, Akers contends that he had a right to amend his third-party complaint to assert a claim against TKO under SDCL 15-6-14 because his third-party complaint was served "no later than ten days after he serve[d] his original

answer." To Akers, his "original answer" for this issue concerns only his "answer" to a July 2013 third-party defendant counterclaim by Sheet Metal against Akers. Akers submits that Sheet Metal's negligence counterclaim "was the first time Akers was alleged to be a tortfeasor," and it was not until that point Akers was able to assert a counterclaim against TKO for contribution on Casper's claims.

[¶85.]       A close review of Sheet Metal's amended answer to Akers's amended third-party complaint does not support Akers's contention. Sheet Metal asserted a counterclaim against Akers for indemnification and contribution in the event Sheet Metal would be found liable. Thus, Akers's "answer" to Sheet Metal's counterclaim was not an "original answer" to Casper's claims as contemplated under SDCL 15-6-14(a). Because Akers filed his "original answer" to Casper's complaint in 2009, Akers was required to obtain leave to assert the third-party claim against TKO when he sought to amend his third-party complaint in July 2013.

[¶86.]       From our review of the record, the court did not abuse its discretion when it denied Akers leave to amend his third-party complaint to add a claim against TKO. Akers did not seek leave to add TKO until 2013, despite knowing well before then that TKO was the management company for the Hotel. Moreover, the court's scheduling order set July 1, 2012, as the deadline to add new parties. Most importantly, Akers's motion came only six months before trial in a case that involved extensive discovery and multiple continuances.

## CONCLUSION

[¶87.]       The circuit court did not err when it denied Akers's motion for a judgment as a matter of law because (1) there was sufficient evidence for the jury to

conclude that Akers breached the Agreement or Addendum and that Akers did not meet his burden of proof on the issue of waiver or on his claim that Casper failed to mitigate its damages, and (2) Casper did not have a duty to present evidence on both the diminution in value and cost of repair measures of damages. The court further did not abuse its discretion when it denied Akers's motions for a mistrial and new trial because (1) the court's curative instruction and striking of Nelson's undisclosed expert opinion was sufficient to overcome the prejudicial effect, (2) the court properly excluded Potter's expert opinion on Casper's line-item damages summary, and (3) Casper's closing remarks were not inflammatory or prejudicial.

[¶88.]     The court's jury instructions, as a whole, properly set forth the applicable law, and, therefore, the court's incorrect statement in one of the two instructions on mitigation does not necessitate a new trial. Furthermore, the court properly refused Akers's requested warranty instruction and damages instruction. The court did not err when it refused to join TKO as an indispensable party and struck Akers's amended third-party claim against TKO. Lastly, the court did not err when it calculated post-judgment interest on the award of prejudgment interest.

[¶89.]     However, because we now overrule *Gettysburg* to the extent it created a rule that prejudgment interest begins to accrue on the date of the breach, the issue of prejudgment interest is remanded for the circuit court to identify the date Casper's loss or damage occurred as a result of Akers's breach. Thereafter, the circuit court must recalculate prejudgment interest and post-judgment interest.

[¶90.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.